[Decided January 25, 1888.]

3w397
14 531

## WILLIAM M. WHITE v. TERRITORY OF WASHINGTON.

1. JURORS—QUALIFICATIONS OF—WOMEN—SEC. 3050 OF CODE—TITLE.—The amendment to section 3050 of Code, purporting to confer the right of suffrage and the right to be jurors upon women, is invalid, on account of having a defective title. The case of *Harland* v. *Territory, ante,* p. 131, reaffirmed. Whether or not the territorial legislature has the power to confer upon women the elective franchise, *quære?*

2. INDICTMENT—MURDER—MANSLAUGHTER—SECTION 1028 OF CODE.—Under section 1028, of the Code, a conviction for manslaughter may be had under an indictment charging murder in the first degree.

3. EVIDENCE—SELF DEFENSE—THREATS—INSTRUCTIONS.—In a case of felonious homicide, when the prisoner pleads self defense, and evidence tending to show communicated and uncommunicated threats by deceased against the defendant has been given, it is error to refuse an instruction that "uncommunicated threats are only valuable in a case of this kind as tending to show the feelings and intent of the deceased towards the defendant at the time of their encounter, and whether or not the deceased was the first assailant, and whether or not the deceased so acted at the time of the shooting as to induce in the mind of the defendant an honest belief that the deceased intended to kill him, or do him great bodily harm. Communicated threats are valuable for the same purpose, and as also tending to throw light on the state of mind of the defendant at and just before the shooting, and as tending to show that his acts in shooting were not malicious."

4. POSSESSION OF LANDS—RIGHT OF ENTRY—OWNER.—A person, though the owner, has no right to invade forcibly the actual and peaceable occupancy of land by another, even if the latter holds the same without right. By

doing so he is a trespasser, and such possessor has the right to defend himself and his possession, if unlawfully assailed by such owner.

5. SELF DEFENSE.—When a man is placed in such a position, that a reasonably prudent man, by the facts and circumstances surrounding him, would have in good faith a well-founded belief that his life was in peril, he will be justified in using such means in defense of himself, and to such an extent, as may fairly appear to be necessary in such defense.

6. JURY—CHALLENGES—COURT, DISCRETION OF.—The trial of challenges to jurors by the court involves the trial of an issue of fact, and its determination is largely discretionary.    The Supreme Court will not disturb the finding of the court below, unless the record discloses an abuse of such discretion.

ERROR to the District Court holding terms at Tacoma. Second District.

All the necessary facts are fully stated in the opinion of the court.

*Mr. John Arthur,* and *Messrs. Struve, Haines & McMicken,* for the Plaintiff in Error.

Women, not being qualified electors, cannot act as jurors. (*Harland* v. *Territory,* 3 Wash. 131.)   Under the organic act of this territory, the territorial legislature has no power to confer the right of suffrage upon women.   (Rev. Stats., sec. 160; *Minor* v. *Happersett,* 21 Wall. 162; *Bradwell* v. *The State,* 16 Wall. 130; *In re Lavinia Goodsell,* 39 Wis. 232; *Robinson's Case,* 131 Mass. 377; *U. S.* v. *Cruikshank et al.,* 92 U. S. 542; *U. S.* v. *Goldman,* 3 Wood's C. C. Rep. 195; *Frasher* v. *State,* 3 Tex. Ct. of App. 271; Ordinance of 1887, sec. 9.) The indictment for murder in the first degree in this case is not sufficient to sustain a conviction of manslaughter. (*Leonard* v. *Territory,* 2 Wash. 381, 400;   1 Wharton Crim. Law, secs. 537, 538.)

As to the admissibility in evidence of communicated and uncommunicated threats, and as to the effect and the weight to be given to them by the jury, counsel cited the following authorities:  *Wiggins* v. *People,* 93 U. S. 465, 467; *Stokes* v. *People,* 53 N. Y. 164, 13 Am. Rep. 492;   *Lyon* v. *Hancock,* 35 Cal. 372; *Campbell* v. *People,* 16 Ill. 17, 61 Am. Dec. 49; Wharton's Cr. Ev., sec. 757;  *King* v. *State,* 13 Tex. Ct. of App. 277, 285.   As to the right of a person in the actual and

exclusive possession of the land to resist an invasion of his possession, even as against the owner, and to use all necessary force to defend such possession, the counsel cited the following: Cooley on Torts, 324, 326; *Railroad* v. *Johnson*, 119 U. S. 611; *Railway* v. *Harris*, 122 U. S. 606; 1 Wharton Cr. Law, 8th ed., secs. 100, 501, 505; *Reeder* v. *Purdy*, 41 Ill. 285; *Ross* v. *State*, 10 Tex. Ct. of App. 464; *Casebeer* v. *Rice*, 18 Neb. 203.

A man need not be in actual, imminent peril of danger of his life, or of great bodily harm, before he may slay his assailant. It is sufficient if, in good faith, he believes from the facts, as they appear to him at the time, that his life is in such imminent peril. (1 Wharton Cr. Law, 8th ed,, sec. 97*a*, 99, 100, 102, 482, 486, 499, 501; *Marnock* v. *State*, 7 Tex. Ct. of App. 269, 275; *Pharr* v. *State*, id. 472; *Jordan* v. *State*, 11 id. 435, 449; *Shorter* v. *People*, 2 N. Y. 197, 51 Am. Dec. 286; 1 Bish. Cr. Law, secs. 841, 845, 849–51; 1 Lawson's Defenses to Crime, 386.)

*Mr. B. W. Coiner, Prosecuting Attorney,* and *Messrs. Judson & Sharpstein,* for the Defendant in Error.

No objection was made to a female being on the jury; hence the disqualification of the juror was waived, and the objection cannot be raised in this court, especially since the disqualification does not appear in the record. (*People* v. *Stonecifer*, 6 Cal. 405; *People* v. *Sanford*, 43 Cal. 29; *People* v. *Honshell*, 10 Cal. 83.)

As to the law relating to uncommunicated threats, counsel cited *Baker* v. *State*, 1 Southern Rep. 127 (Ala., January, 1887). The defendant in error relied upon *Weston* v. *Commonwealth*, 111 Pa. St. 251, and upon *State* v. *Underwood*, 57 Mo. 40, to justify the court below in its refusal to give the instructions asked for by defendant relating to the entry as owner by the deceased upon the land actually but unlawfully occupied by the defendant.

Mr. Chief Justice JONES delivered the opinion of the court.

The plaintiff in error was indicted for murder in the first

degree, committed in the county of Pierce, July 17, 1885, upon the person of one James McMillan.

He was convicted of murder in the second degree and sentenced to the penitentiary.

The facts gleaned from the record, and about which there seems no dispute, are these:

In January, 1878, the defendant William White bought the Connell & Williamson donation claims, about 640 acres, and went into possession thereof. During the month he executed and delivered a mortgage to James G. Williams on the above property for $2,400, and payable in one year. In course of time James McMillan, the deceased, became the owner of the mortgage. The mortgage debt was not paid; and the deceased, at defendant's request, made several extensions of time for payment. Finally, the debt not having been paid, the deceased brought an action to foreclose, in which action defendant appeared. A decree was rendered foreclosing the mortgage, and directing a sale of the mortgaged premises.

The sale was postponed for ten days to enable defendant to raise the money to pay the debt. It was not paid, and the sale took place; the deceased bidding in the property. The sale was confirmed. No redemption was made, and the sheriff executed a deed to the deceased. After the deed had been made, the deceased offered to convey the property to defendant if the latter had the money by a certain day.

About this time, deceased's creditors were becoming clamorous for money, and deceased transferred the property to his father, to whom he was indebted, and the creditors had attached the property before the day arrived on which defendant was to pay for the land.

On the day appointed White reported that he had the money, but owing to the attachments nothing could be done. Defendant's attorneys then endeavored to procure a settlement with the creditors of McMillan, but no arrangement could be made. The agreement made by McMillan was a verbal one and without consideration.

Notwithstanding this, defendant's attorneys brought suit

against McMillan for a specific performance.  A demurrer was interposed, sustained, and plaintiff failing to amend, judgment was rendered against him.  Defendant was then advised by his attorneys to enter the Connell donation claim in his own name, as it was still public land.  Connell had been killed by the Indians before living four years on the land, and so no proof had ever been made by him.  A patent had issued to the Williamson place before the sale.  Although defendant had mortgaged the property, he was still advised that the mortgage was invalid, and consequently all proceedings based on it were void, and that he should homestead the Connell place, and apply to purchase the Williamson place.  Defendant was therefore advised to maintain possession of the Williamson place, and was in the actual occupancy of it from 1878 until after the homicide.  The deceased, to whom his father had leased the property, then had notice served on the defendant to quit the premises.  By this time the relations between the deceased and the defendant had become strained, and each one had made threats as to what he would do in certain events.  McMillan had threatened to have the hay on the Williamson place or blood.

These threats had been communicated to the defendant.  The defendant had threatened that some one would be hurt if McMillan made any attempt to interfere with the land.  The boundary line on the west side of the Williamson place continued on south and formed the western boundary line of the Connell place.

The eastern boundary line of the Williamson place intersected the northern line of the Connell place; the Connell place being a parallelogram, and the Williamson place a square.  There was a break in the fence of the Williamson place.  The defendant was living on the Connell place.  His house was there.  James McMillan, on the day he was killed, went upon said Williamson donation claim to cut the crop of hay or grass raised thereon by White, and did cut a part thereof.  White, learning from one of his sons that McMillan, or some one else, was cutting hay on

the place, put a pistol in his pocket and went to the place where McMillan was cutting the hay.   Arriving there, he found McMillan in a wagon, and demanded of him whether he had "sheriff's papers," or any authority for coming there to cut hay.   McMillan, answering, took up a gun which he had by him in the wagon, and pointing it at White, and calling White's attention to it, said: "This is my authority."   White replied that that was not sufficient authority, and he should cut no hay there until he had better authority, and ordered him to leave the place at once, saying: "You put this in law, and now let the law settle it."   Some talk followed; McMillan keeping the gun pointed towards White, and White endeavoring to elude it. White noticing the growing excitement of McMillan, and that McMillan was raising the gun, said: "Mac, you are excited; don't shoot."

Both fired quickly, McMillan with the gun and White with the pistol.   (The testimony is conflicting as to who fired first.)

After the exchange of shots, White rushed in upon McMillan and seized his gun, meanwhile with one hand firing his own pistol.

Both were wounded.   McMillan's wound proved fatal. After sending for a physician, for camphor, water, etc., and exerting himself to save McMillan's life, White came to Tacoma and surrendered himself to the sheriff.

The defendant assigns a large number of errors, and they are, with one or two exceptions, insisted upon, and have been argued with signal ability by the attorneys on both sides; but the disposition we make of the case will not require an examination of many of them.   It appears that one Miss Maggie Farr was, without challenge or objection, allowed to sit as one of the jurors by whom the defendant was tried.   This court has heretofore decided that the amendment to section 3050 of the Code, as passed by the legislature, whereby it was claimed that women were made electors and became qualified jurors, was invalid, because of the defective character of the title of the act; and as it is

not now possible for a like state of affairs to occur on a second trial, there is nothing in the facts here shown demanding a further examination of the question. The point is made in the brief of counsel, that the territorial legislature have not the power to confer upon women the elective franchise; that question, however, is not necessarily involved in the matter before us, and hence we do not feel called upon to pass upon it.

It is contended that under this indictment the defendant could not be found guilty of manslaughter, and the court had erred in refusing defendant's request so to instruct the jury. Had he been convicted of manslaughter, the question would now be pertinent ; but as he was not so convicted, there has been no injury resulting from the refusal. As the same question may arise upon another trial, however, we deem it necessary to say that under section 1098 of the Code such a conviction may be had under an indictment for murder in the first degree.

Several instructions were asked and refused, and instructions were given and excepted to, relating to threats made by the deceased and the defendant, communicated and uncommunicated as to each.

It is sufficient to say as to these, that the fact that threats had been made by the deceased or the defendant, is admissible in all cases for the purpose, if made by the defendant, of showing the animus of defendant, and as a circumstance affecting his guilt or innocence of the crime charged; having greater or less weight as their character, the occasion, the nearness in time to the killing, and the circumstances may give them weight.

Threats made by the deceased against the defendant would have more or less weight in defendant's favor as affecting his conduct as a reasonably prudent man, under the circumstances, if he was advised of the threats.

The sixth instruction asked for and refused was as follows:

"Uncommunicated threats are only valuable in a case of this kind as tending to show the feeling and intent of the deceased towards the defendant at the time of their encounter, and whether or not the deceased was the first assailant,

and whether or not the deceased so acted at the time of the shooting as to induce in the mind of the defendant an honest belief that the deceased intended to kill him, or do him great bodily harm. Communicated threats are valuable for the same purpose, and as also tending to throw light on the state of mind of the defendant at and just before the shooting, and as tending to show that his acts in shooting were not malicious."

We think this instruction should have been given. It is correct in law, and the circumstances of the case made the rule stated applicable.

The error of the court in giving the thirty-fifth instruction is a key to many of the errors assigned at the trial, and in a great degree to the errors complained of as to threats.

The thirty-fifth assignment is this:

" And in case the court instructs you that if you find from the evidence that James McMillan, on the 17th day of July, 1885, went upon the said premises, then you are instructed that the said James McMillan was rightfully upon said Williamson donation claim, and then and there the said defendant armed himself and went to where the said James McMillan was at work, and such going was for the purpose of driving the said McMillan away from said place for the purpose of preventing or prohibiting the said McMillan from cutting the hay on said land, or for the purpose of executing the threat made by defendant, if any were made against McMillan, or for the purpose of assaulting the said McMillan, or for the purpose of provoking a difficulty with the said McMillan, then such going by the defendant to the place where the said McMillan was so at work, for an unlawful purpose, and in the furtherance of, and in carrying out such unlawful purpose, the defendant killed said McMillan, then he is guilty of manslaughter at least; and if the said killing was intentional and malicious, then defendant is guilty of murder in the second degree, and if said malicious intention had been premeditated and deliberated before, then defendant is guilty of murder in the first degree."

Here the radical error is apparent in the instruction that McMillan was rightfully upon the Williamson claim.

The court, in this instruction, gives the jury to under-stand, as a matter of law, that the deceased had a right to invade the actual possession of defendant, with arms in his hands; and that defendant had no right to go on the prem-ises in his own possession, for the purpose of preventing or prohibiting McMillan from cutting the hay thereon, or even for inquiry why and for what he was there, and if he did so it was an unlawful purpose; and if, in the furtherance of it, the defendant killed McMillan, he was guilty.

This is a more favorable statement than the instruction warrants; in reality, by the force of the terms used, it instructs the jury not only that McMillan had a right thus to invade the possession of the defendant, but also says to the jury that the defendant in fact armed himself and went to the place where McMillan was for the purpose of driving McMillan away for one or more unlawful motives, and that therefore he was guilty of a crime.

It is hard to conceive a more misleading instruction. The title to the land was not a matter of importance in the trial, except as it might throw light upon the intent and motives of the parties.    If McMillan in fact owned the land, it was a fact also that defendant was in the actual and peaceable occupancy of it.

McMillan, it would seem—or at least it may be admitted for the present purpose—had the right to the possession, and might have obtained it by easy and lawful means; but he was a trespasser in the methods he took, and defendant had a right to go where he was, and, under the circumstances, to go armed and to defend himself if assailed.

Many of the errors assigned grow naturally out of the mistaken idea that the title of the land in McMillan, as an abstract question, was a controlling fact, as justifying Mc-Millan's conduct and showing defendant's guilt.

Defendant's actual possession could not lawfully be in-vaded, in the manner attempted, even by the owner.

The court refused several instructions asked by the de-fendant relative to striking in heat of blood, and in a sudden quarrel, and in real, or apparently real, danger.

We conceive the true rule to be that, when a man is placed in such a position that a reasonably prudent man, by the circumstances and facts surrounding him, would have in good faith a well-founded belief that his life was in peril, then he would be justified in using such means in defense of himself, and to such an extent, as might fairly appear to be necessary in such defense.

The instructions asked for and refused, however, in some instances, as in the thirteenth, contain the instruction that in certain circumstances the jury should place but little reliance upon testimony as to verbal declarations.

The jury are the exclusive judges of the evidence and the weight to be given to it, and as to the extent whether little or great reliance is to be placed therein.

A question is raised as to the rulings of the court in sustaining and refusing to sustain challenges to jurors.

Our system provides for the examination of persons challenged into the jury box as to their qualifications to serve as such.

The evidence is heard by the court, and a question of fact is decided by the court. It is largely a discretionary finding.

Two persons may give exactly the same answers to the same questions, and one of them be found competent and the other incompetent. The court sees the persons, observes their manner, their apparent intelligence or want of it, and is justified in weighing their answers, and these circumstances, in passing upon the evidence and finding the fact; and unless the record discloses a fault or an abuse in such finding, this court ought not to reverse it.

In criminal as well as civil cases, a mere possibility of prejudicial error in the record on any question ought not to be allowed to overturn a verdict. It must be shown that there was error of such a character as, at least probably, worked an injury to the party complaining.

The judgment must be set aside and a new trial awarded.

LANGFORD, J., ALLYN, J., and TURNER, J., concurred.