## STATE OF IOWA V. EMMETT SEYMOUR, Appellant.

Murder: EVIDENCE HELD TO ESTABLISH.

Evidence: MURDER. It may be shown that the relations between the defendant and the deceased were not friendly, and that they got angry in discussion.

SAME. It was proper to show, as a motive for the murder, that defendant had committed larceny, that deceased knew that the goods stolen were in the house where both resided, and that defendant was fearful that deceased would disclose this fact to the authorities. *State v. Rainsbarger*, 71 Iowa, 646, *distinguished.*

SAME. To show that defendant had knowledge of where the deceased was going, and knew where to waylay him, evidence that defendant knew that deceased, on the day of the murder, received a letter about which he proposed going to see his son-in-law, was admissible, and defendant's knowledge as to the letter could be shown by evidence that it was discussed after the murder and in the presence of and by the defendant.

IDENTIFICATION. To identify defendant a witness was asked if he knew who the man was that he saw, and he answered that he did not "know positively" but was satisfied in his own mind that he did; and that the man that he saw was the defendant. *Held*, that the testimony was competent.

IDENTIFICATION: SECONDARY EVIDENCE. Witness was asked whether, in the letter received by him, the writer made a statement of what he claimed was a confession made by defendant. *Held*, that the question was proper to identify the letter, and did not call for secondary evidence as to the contents; especially as it was asked on re-direct in relation to matter brought out on cross-examination.

OPINION EVIDENCE. A physician who examined deceased may testify that the wound could have been made by a club like the one in evidence, that it was made by something of that character, and that the injuries were not, in his judgment, due to a fall.

FLIGHT: INSTRUCTION CONSTRUED. An instruction that if defendant, upon being informed that he was suspected of taking the life of deceased, fled to avoid arrest, and remained away, going by an assumed name, that such fact and circumstance are *prima facie* indicative of guilt, is correct, as the word "arrest" evidently

refers to arrest for murder of deceased, and not for other crimes which the defendant had committed.

**Improper Question:** HARMLESS ERROR. Where a physician who examined the deceased was asked whether the identical club in evidence produced the wound, and he answered that he did not know, that it could be—*Held*, though the questions were improper, no prejudice resulted, in view of the answers given.

**Reasonable Doubt.** It was not error to refuse to charge that the state must establish beyond all reasonable doubt that the death of the deceased did not result from natural or accidental causes where the court clearly charged that the jury must find from the evidence, beyond a reasonable doubt, that the defendant inflicted a mortal wound upon the deceased, from which he died.

SAME. It was not error to refuse to charge that, before the defendant could be convicted on circumstantial evidence, the circumstances should all concur to show that he committed the crime, and must all be inconsistent with any other rational conclusion, where the court, after charging as to the weight and convincing power of circumstantial evidence, and the reasonable inferences to be drawn therefrom, added that "if, in connection with the positive evidence before you, you have no reasonable doubt as to the defendant's guilt, you should convict him, but, if you then entertain such doubt, you should acquit him."

**Alibi.** It was not error to omit to instruct with reference to an *alibi* where the murder occurred about 8 o'clock, and there was no testimony as to the whereabouts of defendant from 7:30 to 8:15 o'clock, and the defendant could have committed the deed in that time. *State v. Porter*, 74 Iowa, 623, *distinguished.*

*Appeal from Jones District Court.*—HON. J. H. PRESTON, Judge.

WEDNESDAY, MAY 22, 1895.

December 17, 1890, defendant was indicted for the crime of murdering his father-in-law, one G. P. Fifield. In June, 1894, he was tried and convicted of the crime of murder in the second degree, and was sentenced to imprisonment for life. He appeals.—*Affirmed.*

*Shehan & McCarn* and *Remley & Ercanbrack* for appellant.

*Milton Remley,* attorney general, *E. H. Hicks,* county attorney, and *F. O. Ellison* for the state.

Deemer, J.—The body of George P. Fifield was found lying on the Northwestern Railway track, in the suburbs of the city of Anamosa, at about 8:20 o'clock in the evening of the ninth of September, 1890. It was lying within a few feet of a small culvert; the feet in the center of the track, the body diagonally across it, the head resting on a tie on the north side of the track. The body was inclined to the left, with the face turned up. His hands were in the pockets of his trousers. He was bleeding freely, as the nostrils and his mouth were filled with blood. The skull was crushed and fractured on the right side of the head, and a small hole was noticed in the right temple. The left side was somewhat bruised, but there was no fracture or abrasion of the skin on this side. When discovered, he was breathing very hard, and was unconscious. Almost immediately upon his discovery, he was removed to his home, where he died within a short time. The deceased was defendant's father-in-law, and, prior to his death, lived with defendant and his daughter upon a farm not far from Anamosa. The son and father-in-law did not get along pleasantly together. They frequently quarreled and bickered over matters of more or less importance, and a feeling of antipathy gradually grew up between them. Before the death of Fifield the defendant had been concerned in various larcenies in the town of Anamosa, and at that time had quite an amount of stolen property in and around the house upon the farm where he resided. It is claimed by the state that Fifield was murdered by

being struck with a club, on the right side of the head, where the fracture was located, and that defendant is the person who committed the murder; that defendant naturally disliked the deceased, and had threatened to take his life, but that the immediate motive for the murder was the fact that the defendant was in dread of the discovery of the stolen property by the deceased, and of his delivery to the authorities, to meet retribution for the crimes he had committed. The defendant's counsel insist that no crime was committed; that the death of Fifield was due to his accidentally falling upon the iron railway track; or if this be not true, and it should appear that some one was guilty of a homicide, that defendant is not the guilty party. The case is before us on certain errors alleged to have been committed by the trial court, as well as upon the sufficiency of the evidence to justify the verdict.

Deceased left his home about 7 o'clock in the evening of the day on which he met his death, to go to that of another son-in-law, who lived in the outskirts of the town of Anamosa. He went, as was his custom, part of the way along the railway track. He reached his destination in a few minutes, and, after attending to the errand which called him, started to return about 8 o'clock in the evening, and within a few minutes met with the injuries which caused his death. The defendant left his home within a few minutes after Fifield's departure, riding a dark-colored horse. He was next seen, except as hereinafter noted, at or near the postoffice in Anamosa, about 8:15 P. M. He rode up to near the postoffice at this time at quite a lively pace, and when he reached there his horse was breathing hard, and was perspiring quite freely. The state sought to prove that defendant knew deceased was going to visit his

son-in-law during the evening, and that he took advantage of the opportunity to waylay and murder him. To establish the defendant's knowledge of the proposed visit of the deceased, the state was permitted to show that on the day of the homicide the deceased received a letter from a son, asking for fifty dollars, which fact was known to defendant; and that defendant also knew that deceased was going to the house of his other son-in-law, Judson, regarding the matter. We extract the following from the record, showing the questions propounded to a witness, Mrs. Winslow, to establish these matters: "Q. Now state, Mrs. Winslow, when and by whom you heard the contents of this letter discussed. (Objected to by counsel for defendant as being immaterial, irrelevant, and for the reason she says she did not hear it discussed till after the murder, and it calls for incompetent testimony unless it was shown that it was discussed by the defendant. Objection overruled, and defendant excepts.) A. It was discussed in the family, but I can't state as to anyone in particular. It was talked there; we talked it over. The defendant was present some of the time when it was discussed, I think. I could not tell how soon after the murder. Things were so mixed up in my mind at that time that I can't say exactly. It was a few days. Q. Now, will you state, Mrs. Winslow, all that was said, as near as you can recollect, at that time, in the presence of this defendant, concerning the contents of that letter? (Objection by counsel for defendant as being immaterial, irrelevant, and incompetent; that the witness says she does not know when he was present and when he was not. Objection overruled, and defendant excepts.) A. It was merely that the letter was from the son Henry, asking for fifty dollars." Claim is made that these rulings are erroneous because it was not shown

that defendant was present and heard these conversations. The claim is based upon a misapprehension. The witness testified that defendant was present some of the time when the matter was discussed. It was also shown by another witness that defendant was present when the letter was read, and that he discussed the advisability of sending the money to the son of deceased. The same witness was interrogated as to a quarrel between deceased and defendant over a certain note, and was asked this question: "Q. State whether or not Mr. Seymour threw this note into the fire. (Objection was made to the question as leading, which objection was overruled, and witness answered.) A. Well, I cannot positively say which one of them did throw it into the stove, but, whoever did throw it, I remember very distinctly they set the lid of the stove down very solid." We do not think the objection was good. It may be the answer was not responsive, but no such attack was made upon it. This witness was also asked whether deceased and defendant would get angry in some of the discussions, to which she answered that they did. Another witness was permitted to state that these parties were not on friendly or speaking terms on a certain day. Objection was made to such testimony, and overruled. We think the rulings were correct. *State v. Shelton,* 64 Iowa, 333; *State v. Rainsbarger,* 71 Iowa, 746. The state was permitted to show by several witnesses that the defendant had committed a number of larcenies in the town of Anamosa prior to the death of Fifield, and that he, defendant, had much of the stolen property in and upon the premises where they both resided. We think this testimony was proper, for it tended to show a motive for the killing. The claim is made that these parties were hostile to each other, that defendant had stated he intended to

take the life of Fifield, and that one of the motives which prompted the murder was the fact that deceased knew that some of the property concealed about the place was stolen, and that defendant was in constant fear that deceased would disclose this matter to the authorities. As bearing upon this question that the testimony last above referred to was admissible, see *State v. Kline*, 54 Iowa, 183. The case is quite different from *State v. Rainsbarger*, *supra*. No claim was made in that case that proof of the commission of the other crimes tended to show a motive for the commission of the offense there charged.

A physician who attended the deceased after his injuries, and who probed the wound, and dissected the scalp and skull of the deceased, was asked to give his opinion regarding the nature of the instrument which was used in inflicting the wound, and as to whether a certain club produced upon the trial could have been the instrument used. He was also asked for his opinion as to whether the wound was due to a fall, or was inflicted with a club in the hands of some person. Objections to each and all of these questions were overruled, and witness was permitted to answer that the wound could have been made by a club like the one in evidence, and that, in his judgment, it was made by something of that character, and that the injuries were not, in his judgment, due to a fall, but were inflicted by a club. These rulings were each and all correct. *State v. Morphy*, 33 Iowa, 270; *State v. Porter*, 34 Iowa, 131. Witness was also asked as to whether it was the identical club which produced the wound. And to this he answered he did not know; that it could be. The questions were improper, but no prejudice resulted, in view of the answers given. Complaint is made of the introduction of a certain club in evidence because it is said the same

was not properly identified. We think there was sufficient testimony to justify the court in allowing it to go to the jury. We do not set out the testimony, as it would serve no purpose to do so. A witness by the name of Bemrose was at the Judson house at the time the deceased was there, and left before the deceased did. Just as he left he discovered a man skulking around the house. He was asked if he knew who the man was, and he answered, "Not positive." He was then asked, "Do you know now?" to which an objection was interposed because the question called for incompetent testimony. He answered, "I don't know positive, but am satisfied in my own mind I do." He was then asked, "Now, give us your best judgment as to who that man was." A like objection was made to this question as to the one last above, which was overruled, and witness answered, "It was Emmett Seymour." Complaint is made of these rulings. We think they are correct. *State v. Lucas*, 57 Iowa, 501. True the exact questions presented were not made in that case, but the reasoning of the court is peculiarly applicable to this. See, also, Wharton, Cr. Ev. section 459; *Com. v. Williams*, 105 Mass. 63; *Beale v. Posey*, 72 Ala. 323. A witness was asked as to whether or not, in a certain letter received by him, the writer made a statement or gave a statement of what he claimed was a confession of the defendant while he was in custody in the state of Illinois. This did not call for the contents of the letter except as it directed attention to the subject-matter thereof for the purpose of identification. So construed, it was proper. Again the question was asked on re-examination, and related to a matter brought out by defendant's counsel on cross-examination. Various other rulings on the admission and rejection of testimony are complained of. We have examined all

with care, and, without setting them forth in detail, content ourselves with saying that we discover no prejudicial error.

II. It is insisted that the court failed to instruct on a material question involved in the case in this: that there was evidence tending to show an *alibi*, and no instruction was given with reference thereto. No such instruction was given, and none was asked by defendant. The point seems to be raised in this court for the first time. We do not think there was reversible error in failing to give such an instruction. The testimony tended to show that defendant left his home on horseback at from 7 to 7:30 o'clock P. M.; that he was next seen by witness Bemrose at or near the Judson house, very shortly prior to the homicide. Defendant was next seen about midway between the place where the murder occurred and the postoffice in Anamosa, riding his horse at "a pretty good clatter, pretty lively." About 8:15 he was seen near the postoffice. His horse, from which he had just dismounted, appeared to have been ridden quite hard. The distance between the point where deceased was found and the postoffice is less than half a mile. There was no other testimony tending to show the whereabouts of the defendant from 7:30 to 8:15. Deceased received his injuries, as near as we are able to judge, just before 8 o'clock. We do not think the evidence demanded an instruction such as is now contended ought to have been given. In the case of *State v. Porter*, 74 Iowa, 623, relied upon by defendant's counsel, there was evidence tending to support an *alibi*, and an instruction was asked upon that question.

III. It is also claimed that the court was in error in refusing the following instruction asked by the

defendant: "(1) The state must establish beyond all reasonable doubt that the death of George P. Fifield did not result from natural or accidental causes, and if a reasonable doubt arises whether the death resulted, on the one hand, from natural or accidental causes, or, on the other, from the wicked and deliberate act of the defendant, the defendant should be entitled to the benefit of such doubt, notwithstanding there may be strong but merely circumstantial evidence against him, and you should acquit him." Running through all the instructions given by the court on its own motion is the thought, made prominent by frequent repetitions, that, before defendant could be convicted, the jury must find from the evidence and beyond a reasonable doubt that the defendant inflicted a mortal wound upon the head of Fifield, by reason of or from the effects of which he died. We think the jury were fully advised in the instructions given that they must find beyond a reasonable doubt that death did not result from natural or accidental causes before they would be justified in convicting the defendant.

IV. The defendant also asked an instruction to the effect that, before the defendant could be convicted on circumstantial evidence, the circumstances should all concur to show that he committed the crime, and must all be inconsistent with any other rational conclusion. In lieu of this, the court gave the following: "* * * You are instructed that circumstantial evidence is to be regarded by the jury in all cases, and is many times quite as conclusive in its convincing power as direct and positive evidence of eye-witnesses. When it is strong and satisfactory, the jury should so consider it, neither enlarging or belittling its force; it should have its just and fair weight with you; and if, when it is all taken as a whole,

and fairly and candidly weighed, it convinces the guarded judgment, you should convict, and on such conviction you are not to fancy situations or circum stances which do not appear in the evidence, but you are to make those just and reasonable inferences from circumstances proven which the guarded judgment of a reasonable man would ordinarily make under like circumstances. You are not artificial beings, governed by artificial or finespun rules, but you should bring to the consideration of the evidence before you your every-day common sense and judgment as reasonable men, and those just and reasonable inferences and deduc-tions which you as men would ordinarily draw from facts and circumstances proven in the case you should draw and act on as jurors; and if, in connection with the positive evidence before you, you then have no reasonable doubt as to the defendant's guilt, you should convict him, but, if you then entertain such doubt, you should acquit him." The instruction given covers substantially the same thought as the one refused. The instruction asked was also faulty in that it elim-inated all the direct evidence in the case, and required the jury to acquit in the event the circumstances did not all concur to show that defendant committed the crime, or if they could be explained on any rational theory consistent with his innocence.

V.   The instruction with reference to reasonable doubt is complained of. It was undoubtedly framed after a careful consideration of the case of *State v. Ostrander,* 18 Iowa, 435, for in it is almost the identical language employed in that case. We will not set out the instruction. Similar ones have been frequently approved by this court in a great number of cases.

VI.   The court instructed the jury, in substance, that, if defendant had been found guilty of certain

larcenies before the death of Fifield, it should not be considered by them in determining the question of his guilt in the case upon trial, and should not be considered for any other purpose except to determine the motive of defendant in the commission of the homicide, if they found he did commit it. From what has been said with reference to the admission of the testimony covering this point, it sufficiently appears that we think the instruction was correct.

VII. The twelfth instruction was as follows: "If you find from the evidence that the defendant, upon being informed that he was suspected of taking the life of said George P. Fifield, fled to avoid arrest, and remained away, going under an assumed name, such fact is a circumstance which *prima facie* is indicative of guilt." It is insisted that this instruction was erroneous. There was evidence in the case to establish the facts upon which it is predicated, and the rule of law announced has been approved by this court in the following cases: *State v. James*, 45 Iowa, 412; *State v. Schaffer*, 70 Iowa, 371; *State v. Arthur*, 23 Iowa, 430; *State v. Boyer*, 79 Iowa, 330. It is said the instruction is faulty because it does not relate to fleeing from arrest for the crime charged; that under the rule announced, if defendant fled the country to avoid arrest for the larcenies he had committed, such fact would be a circumstance *prima facie* indicative of his guilt of the crime of murder. We do not think the instruction will bear this interpretation. The "arrest" referred to in the instruction plainly means arrest for taking the life of George P. Fifield. No other construction can be placed upon it without doing violence to the language used. The instruction undoubtedly states a correct proposition of law, and one having support in the record. If defendant desired

a more specific instruction, he should have asked it.
*State v. Watson,* 81 Iowa, 380.

VIII.   It is earnestly contended the verdict is not supported by the evidence.   We have carefully read and re-read the whole of the testimony, and given the case the attention its importance demands, and, without setting forth the testimony on which we reach our conclusions, we find that the verdict has abundant support in the testimony.   The defendant confessed the killing to the officer who arrested him in the state of Illinois, where he was going under an assumed name.   In addition to this are many facts and circumstances which we think point conclusively to the defendant's guilt.   His confession, if true, with proof of the *corpus delicti,* was alone sufficient to justify the jury in returning the verdict found in this case. But the state was not compelled to rely upon this confession alone.   A conviction might well have been had upon the other testimony, independent of the confession.   The punishment inflicted, while severe, was fully merited.   Defendant undoubtedly laid in wait for his victim, and coolly and deliberately murdered him, either because of some grudge or to shield himself from being discovered in the commission of other crimes.   We do not feel like interfering with the sentence.   The judgment of the district court is *affirmed.*