THE STATE OF IOWA, Appellee, v. J. W. CROFFORD, Appellant.

Murder: CHALLENGE OF JUROR FOR CAUSE: EVIDENCE. On a prosecution for murder the defendant's challenge of a trial juror should be sustained where his examination shows that he resided in the same community as deceased, had heard and discussed the circumstances of the alleged crime, had read the testimony against defendant and believed it to be true, and admitted he was not unprejudiced, notwithstanding the fact that on cross-examination he expresses a belief in his ability to render an impartial verdict.

Conspiracy: PRIMA FACIE CASE: ACTS OF CO-CONSPIRATOR. In a prosecution for murder, the result of an abortion, proof that the party guilty of criminal intimacy with deceased, was at defendant's sanitarium and had a conversation with him a short time prior to the abortion and afterward visited deceased at the sanitarium, is sufficient to make a *prima facie* case of collusion and render admissible against defendant, evidence of subsequent acts, writings and statements of such person made in pursuance of the common unlawful purpose.

Proof of Conspiracy: DECLARATION OF CO-CONSPIRATOR. A conspiracy must be shown by evidence outside of the statements

sought to be proved as having been made by a co-conspirator, before the jury may rightfully consider such declarations.

Statements of Co-Conspirator: WHEN ADMISSIBLE. Statements
4   made by one co-conspirator before the conspiracy was formed or after it has been accomplished are not admissible against another co-conspirator.

Conspiracy: HOW DETERMINED. The question of a prima facie
5   case of conspiracy, for the purpose of admitting the declarations of co-conspirators, is for the court, but a final determination of the fact of conspiracy is for the jury, under proper instructions.

Evidence of Prior Abortion. In a prosecution for murder, the
6   result of abortion, evidence that defendant's co-conspirator, prior to the claimed conspiracy, sought to procure another physician to commit a prior abortion on deceased, is inadmissible against defendant.

Evidence of Other Abortions. Evidence that defendant committed
7   abortions upon other persons is not admissible.

Weight of Evidence: BY WHOM DETERMINED: INSTRUCTION REGARDING.
8   The relative weight and value of evidence, whether circumstantial or direct, is for the jury to determine, and it is error for the court in its instructions to draw a comparsion between the two classes of evidence to the disparagement of either.

Instruction: CONVICTION-OR ACQUITTAL. An instruction admonish-
9   ing the jury that a failure to perform its duty by which a crime, if one is shown, may go unpunished and a criminal escape the penalty of his act and that it cannot be corrected by a new trial, is error.

*Appeal from Decatur District Court.*—HON. H. M. TOWNER, Judge.

MONDAY, OCTOBER 19, 1903.

INDICTMENT for murder in the second degree. The de fendant was convicted, and appeals. —*Reversed.*

*V. R. McGinnis, C. W. Hoffman* and *M. L. Temple* for appellant.

*Chas. W. Mullan*, Attorney General, and *Chas. A. Van Vleck*, Assistant Attorney General, and *A. P. Olsen*, for the State.

.WEAVER, J.—The appellant is a physician, and for several years prior to the date of the crime with which he is charged conducted a sanitarium or hospital at Lamoni, in Decatur county.   Maud Stone, a young unmarried woman, about twenty-one years of age, residing with her parents upon a farm in said county, entered the appellant's sanitarium about January 22, 1901, and died there one week later.   A post-mortem examination revealed, as it is claimed, evidences that she had been lately pregnant, and had suffered an abortion.   It is the theory of the state that the pregnancy was the result of an intimacy between the young woman and one Ira Hammond (who is jointly indicted with the appellant), and that at the instigation or employment of Hammond, appellant, by the use of violent and unnatural means, produced a miscarrige or premature delivery of the fœtus, in which operation the young woman received injuries causing her death.   Defendant pleads not guilty to the charge.   On the trial he admits that Miss Stone came to his sanitarium, and there died, but avers that, if she suffered an abortion, the same had occurred before she came under his care, and that he had no knowledge thereof, or part therein.   With this brief outline of the case, we proceed to a consideration of the principal points relied upon in the arguments of counsel.

I.   In selecting the trial jury, one Fisher, a member of the regular panel, was called, and examined as to his competency and qualification to serve.   In response to inquiries by counsel and by the court he said, among other things:   "I have formed and expressed an opinion in regard to the merits of the case.   *   *   *   Have heard the case discussed frequently.   Have read the testimony before the coroner's jury.   Heard some of the witnesses discussing the case. I live at Decatur City.   She [Miss Stone] lived in the same township.   Have heard the case discussed over there, and

1. CHALLENGE of juror for cause: evidence.

have formed from that an opinion.   Undoubtedly it would take evidence to remove that opinion.   I have my mind made up at this time as to his guilt or innocence, and it would take evidence to remove it.   I am not unprejudiced. I believe what I have heard.   *   *   *   I read the newspaper accounts of all the testimony that was published of all the witnesses before the coroner's jury.   I believed what they swore to was true, and have that same belief now."   To further questioning the juror said:   "If the evidence was sufficient, I do not think my opinion would prevent my rendering a true verdict.   *   *   *   I think I would render a fair and impartial verdict.   I think, notwithstanding the newspaper accounts, I could render a fair verdict upon the evidence submitted.   *   *   *   Do not think I would be influenced by what I have read."

The appellant's challenge to this juror was overruled, and upon this ruling error is assigned.   In these days when the story of every alleged crime of a serious nature is promptly heralded by the newspapers, and comes quickly to the knowledge of the great body of intelligent citizens of the county, it is scarcely possible, even if it were thought desirable, to obtain a jury of average men having no impressions or opinions as to the merits of the case.   In view of this fact we have in numerous cases refused to sustain an appeal based upon the overruling of challenges, where, notwithstanding such impressions or opinions, it fairly appears that the juror is fair-minded and unprejudiced, and is able and willing to render an impartial verdict.   *State v. Bruce*, 48 Iowa, 530; *State v. Sopher*, 70 Iowa, 496; *State v. Vatter*, 71 Iowa, 558; *State v. Munchrath*, 78 Iowa, 271; *State v. Fie'd*, 89 Iowa, 35; *State v. Brady*, 100 Iowa, 194; *State v. Bone*, 114 Iowa, 542.   In the opinion of some of the members of this court, some of the cases above cited have gone to the extreme verge of liberality in this respect, and the rule thus established ought not to be further extended.   The question to be de-

termined by the trial court upon such a challenge is whether the juror has formed or expressed such an opinion as will "prevent him from rendering a true verdict upon the evidence submitted on the trial" (Code, section 5360); and as the juror's conduct, demeanor, and bearing in court may properly be accorded material weight in considering the facts discl)sed by his answers, we are reluctant to interfere with the exercise of the court's discretion.

It must not be overlooked, however, that the right to have an impartial jury, who will hear the case calmly and dispassionately, and render a verdict upon the evidence, and the evidence alone, uninfluenced by public clamor or preconceived opinions, is absolutely essential to the proper administration of justice. To put a man upon trial before jurors who already believe him guilty—no matter how upright such jurors may be, nor how sincere their purpose not to allow their prejudices any influence upon their verdict—is to expose the accused to a hazard wholly inconsistent with the just and humane theory upon which our criminal procedure is founded. It is readily conceivable that an opinion of a defendant's guilt may be so qualified in the juror's mind as not to be a sufficient ground of challenge. For instance, a juror who says that, if the statements he has heard or read be true, then, in his judgment, the accused is guilty, is not necessarily subject to challenge. *State v. George,* 62 Iowa, 682; *State v. Ostrander,* 18 Iowa, 451; *Trimble v. State,* 2 G. Greene, 404; *State v. Sater,* 8 Iowa, 420. In such case the opinion of guilt is based upon the hypothesis that certain facts exist, but the truth of the hyothesis itself is a matter upon which the juror's mind is still open and undetermined. Where, however, the juror discovers that he has become convinced of the truth of the alleged evidence, and therefrom has reached a satisfactory conclusion of the guilt of the accused, a very different situation is presented. He may be a man of fair intelligence and pure purpose, sincerely in-

tending to give the accused a fair trial; but what certainty is there that he can do it?   It may be too much to say that no man can so far divorce himself from his settled belief in a defendant's guilt as to weigh and consider conflicting testimony and draw conclusions therefrom with the same unbiased mind and judgment which he would employ in a case concerning which he has never formed an opinion: but such happily constituted persons are, to say the least, very rare.   The man and the juror are one, and the theory of the dual existence in one personality of a biased man and an impartial juror has not been so fully demonstrated that we may safely act upon it in the administration of justice.   A person accused of crime should bear no greater burden than is created by the evidence produced against him on the trial, and the juror who passes upon that evidence should come to its consideration unhampered, and unembarrassed by any ready-formed convictions as to the vital fact or facts in controversy.   In so far as the accused must address himself to the removal of unfavorable opinions imparted into the jury box from any other source than the sworn testimony, to that extent he is denied the fair trial which the law guaranties him. A crime of the character charged in this case becomes at once a matter of general and earnest discussion in the neighborhood in which it is committed.   Theories of the guilt or innocence of suspected persons, supported by facts, circumstances, rumors and conjectures, are common topics of conversation, and it is scarcely conceivable that one who has lived in such atmosphere can avoid a mental condition which precludes his being a fair juror. This, we think, was the case with the juror Fisher.   He lived in the same township with the girl alleged to have been murdered.   He had heard the circumstances discussed.   He had discussed them himself; had not only read substantially all the testimony against the defendant, but believed it to be true; had made up his mind.   He

candidly said he was not unprejudiced, and believed the truth of what he had heard. It is true that upon a somewhat persistent cross-examination the juror expressed belief in his ability to render an impartial verdict, but, however honest and sincere this estimate of his mental condition, we think the circumstances as stated by him make its correctness so doubtful that the challange to his competency should have been sustained.

II.   As already stated, the alleged criminal abortion resulting in Miss Stone's death occurred in January, 1901. That the young woman was pregnant from a date not

2. CONSPIRACY·
prima facie
case: acts of
co-conspir-
ator.

earlier than the preceding October or November, and that this condition was the result of an intimacy with Hammond, and that he was active in advising and assisting her in bringing about a miscarriage, is sufficiently indicated by the testimony. The theory of the state is that, in pursuance of this unlawful purpose, Hammond entered into a conspiracy with appellant, who, being a physician, administered the treatment by which a premature delivery was produced. There is no evidence that Hammond and appellant ever met or had communication or dealings with each other prior to January 12, 1901. On that date, which was about ten days before Miss Stone entered appellant's sanitarium, it is shown by one· or two witnesses that Hammond visited the place, and had a private interview with appellant. Other evidence tends to show that Hammond was again at the sanitarium while Miss Stone was an inmate there. These facts, with other circumstances relating to the subsequent acts and statements of appellant, were sufficient, we think, to make a *prima facie* case of collusion between said parties dating from their first proven interview, and justifying the admission in evidence of the subsequent acts, writings, and statements of Hammond, done or made in pursuance of the common unlawful purpose.

In support of the indictment the state introduced in evidence, over appellant's objection, a series of letters by Hammond to Miss Stone, found among her effects after her death.    They bear date beginning with July 19, 1900, and ending with January 15, 1901.    These letters, with others written by Miss Stone and offered in evidence by appellant, reveal a most surprising and pitiful story of human weakness and unbridled passion, the details of which need not here be related.    Suffice it to say it is made clear that for a year or more preceding the unfortunate woman's death these parties had maintained illicit relations, resulting in her pregnancy as early as July, 1900, if not one or more earlier pregnancies, and that exposure had been avoided by miscarriages brought about through the advice or procurement of Hammond. The language of the letters written in July, August, and September indicate unmistakably that somewhere about August 20, 1900, Miss Stone, acting with the advice and consent of Hammond, went to Lamoni for the purpose of procuring a miscarriage, and that, such purpose being accomplished, Hammond drove to Lamoni, and took the young woman to her home.    There is, however, an entire lack of any fact or circumstance in the record showing the place where, or the person by whom, the unlawful act was committed.    It is true that Lamoni was then the place of appellant's residence, and one witness testifies to having seen Miss Stone about that time upon the street in front of the sanitarium.    But these circumstances alone do not arise to the dignity of evidence tending to connect appellant with the crime then committed.    The lack of evidence is emphasized when we recall the principle that the alleged conspiracy must be shown by testimony out-

3.  PROOF of conspiracy: declarations of co-conspirator.    side of the declarations and statements which are sought to be admitted as having been made by a co-conspirator.    The combination or confederacy is presupposed, and must be established

by other evidence before the jury can rightfully give any consideration to such statements. See, *Wiggins v. Leonard*, 9 Iowa, 194. In the absence, therefore, of any proof tending to point out the appellant as having assisted in producing the abortion of August, 1900, and of any collusion or conspiracy between him and Hammond until January 12, 1901, we are constrained to hold that the admission of letters preceding the latter date was error. It must be remembered that the appellant was alone upon trial, and that the matter admitted in evidence consisted of unsworn statements made by another person, not in his presence or hearing, and not addressed to him. The rule which allows the statements of one co-conspirator to be given in evidence against another is a marked exception to the general rule, which excludes hearsay testimony, and applies only where those statements are made pending the conspiracy, and in furtherance of its unlawful purpose.

Statements made by a conspirator before the conspiracy was formed or after it has been accomplished, fall within the general rule, and are not admissible except as against the person making them. Such is the *4. STATEMENTS of co-conspirators: when admissible.* doctrine which has been repeatedly announced in this state, and, so far as we are aware, of universal prevalence in all courts administering justice according to the common law. *State v. Nash*, 7 Iowa, 347; *Johnson v. Miller*, 63 Iowa, 529; *State v. Weaver*, 57 Iowa, 730; *State v. Arnold*, 48 Iowa, 566; *Taylor County v. Standley*, 79 Iowa, 672; *State v. Grant*, 86 Iowa, 216; *Spies v. People*, 3 Am. St. Rep., note. The Attorney General evidently, appreciating the force of these objections to the testimony under consideration, urges that, even if inadmissible on the theory of a conspiracy, it was competent as tending to show the intimacy of Miss Stone with Hammond. The pertinency of this suggestion would be very apparent were Hammond on trial, but such is not the case. Appellant was being tried for an act alleged to

have been committed in January, 1901, and proof of an-
other abortion, produced in August, 1900, by some person
unknown, could have no bearing upon his guilt of the
particular crime charged, without other testimony tending
to show his guilty connection with the earlier offense.

III.  Referring further to the subject of the last
preceding paragraph, it may be said that the *prima facie*
showing of conspiracy is first addressed to the court alone,
simply as governing its action in the admis-
sion of evidence; but, whenever such a *prima
facie* case is made, the final determination
whether such conspiracy did or did not exist should be left
to the jury.  *Taylor County v. Standley, supra; State v.
McGee,* 81 Iowa, 17.  The court below gave the jury no
instruction upon this subject, and no specific direction as
to how or to what extent the letters of Hammond might
be taken into consideration in determining the question of
defendant's guilt.  The finding of a conspiracy was a
necessary preliminary to the consideration of the letters
for any purpose, and we think an instruction to that effect
should have been given.  *Wiggins v. Leonard,* 9 Iowa, 194.

IV.  B. I. Eiker, a physician testifying on behalf of
the state, was permitted to say that shortly prior to
August 7, 1900, Hammond applied to him to examine Miss
Stone, and determine whether she was preg-
nant, and that Hammond then asked the wit-
ness to help him out of the difficulty.  On the principle
hereinbefore approved, this evidence should have been
excluded.  This act on part of Hammond was long before
the time when the testimony indicates that the conspiracy,
if any, between Hammond and appellant, was formed.
Indeed, the very fact that Hammond was applying to an-
other physician is an affirmative indication that at that date
he had entered into no arrangement with the appellant.

V.  Certain witnesses for the state were allowed to
give testimony tending to show that appellant had pro-

5. CONSPIRACY: how determined.

6. EVIDENCE of prior abortion.

duced other abortions upon other women than Miss Stone.

**7. Evidence of other abortions.** We have lately had occasion to consider an admission of evidence of crimes other than the one charged in the indictment, and have held that, subject to certain well-defined exceptions, it should be excluded. *State v. Vance,* 119 Iowa, 685; *State v. Roscum,* 119 Iowa, 330. The present case does not, in our judgment, come within the recognized exceptions to the rule, and the objection to the evidence should have been sustained. *Parkinson v. People,* 135 Ill. 401 (25 N.; E. Rep. 764, 10 L. R. A. 91); *Baker v. People,* 105 Ill. 452; 3 Russell, Crimes (5th Ed.) 368; Wharton's Criminal Evidence (5th Ed.) sections 29, 30; *State v. Lapage,* 57 N. H. 245 (24 Am. Rep. 69); *Shaffner v. Commonwealth,* 72 Pa. 65 (13 Am. Rep. 649); *Commonwealth v. Grief,* 16 Ky. 198 (27 S. W. Rep. 814); *State v. Rainsbarger,* 71 Iowa, 746; *Boyd v. U. S.,* 142 U. S. 450 (12 Sup. Ct. Rep. 292, 35 L. Ed. 1077); *People v. Jones,* 31 Cal. 565; *Spurlock v. Commonwealth,* 14 Ky. 605 (20 S. W. Rep. 1095); *People v. Schweitzer,* 23. Mich. 301; *Morris v. State,* 16 Miss. 762.

VI. Paragraph fourteen of the court's instruction was devoted to the definition and discussion of circumstantial evidence. It is too long to be set out in full, but **8. Weight of evidence: by whom determined: instruction regarding.** the following extract therefrom will make clear the points of objection made by appellant. "Circumstantial evidence is legal evidence, and is not to be discredited merely as such. Its value, and, indeed, its necessity, in the ascertainment of truth is unquestioned. Nothing in the nature of circumstantial evidence renders it less valuable than other evidence. Indeed, it has been said that in many cases a verdict on circumstantial evidence alone is more satisfactory as being a true and just verdict than one founded on direct evidence; for witnesses may falsify, but circumstances cannot. Men may commit a perjury, but a

fact cannot. Persons accused have been sometimes erroneously convicted upon circumstantial evidence. But so have they been upon direct testimony. That such in either case has been true is a reason for caution, but not to discredit or disregard. The possibility of error alike exists whether the evidence be direct or circumstantial." The language here employed is not without support in the authorities. Indeed, we assume that the learned discusson of circumstantial evidence by Chief Justice Shaw in the celebrated case of *Commonwealth v. Webster*, 5 Cush. 295 (52 Am. Dec. 711), served to a great extent as the model upon which the instruction was formed. It may further be said that this court has approved instructions embodying some one or more of the several propositions which are arrayed in the foregoing quotation, but we think none of our own precedents go to the full extent of the charge here given. *State v. Moelchen*, 53 Iowa, 315; *Wheelan v. R. R.*, 85 Iowa, 176; *State v. Seymour*, 94 Iowa, 708. The question before us is not so much whether this statement of the nature and comparative value of circumstantial evidence is correct, or may have proper place in a text-book or thesis upon the law of evidence, as it is whether, under the practice of this state, such a discussion has any legitimate place in instructions to a jury. In considering this proposition care must be exercised to avoid being misled by cases adjudicated in other states where different practice prevails. Until within a comparatively recent period it was the general rule that the trial court could rightfully discuss the evidence in its charge to the jury, and express an opinion as to the credibility and weight of the testimony offered. That rule still prevails in some jurisdictions. In others the rule which we have adopted restricting the court to a mere statement of the law, without suggesting any opinion upon the facts, is followed; while in still others the ancient practice in this respect has been modified, but not wholly changed. For

this reason many of the cases relied upon in the argument
for the state cannot be accepted as in all respects applic-
able here.    Suppose, for instance, the case before us to be
precisely parallel in all its facts with *Commonwealth v.
Webster*, and that the trial court had adopted verbatim
the entire charge delivered by Chief Justice Shaw. · In
such case, we think, no lawyer familiar with our statute
and practice would for a moment contend that the verdict
could be sutsained, even though, under the law and prac-
tice in Massachussetts, it would be invulnerable.    That
charge abounds in discussion of the evidence, and directs
the jury as to the comparative weight and value of partic-
ular facts and circumstances in a manner which, however
just in itself, would, of necessity, be held by us an inva-
sion of the province of the jury.    And this we think the
fatal error of the instruction we are now considering.

The case made by the state was almost entirely cir-
cumstantial, while the defendant's case consisted almost
entirely of direct evidence in denial and explanation.
Now, if the court had said to the jury, "The defendant's
witnesses may have committed perjury, but the facts and
circumstances proven by the state cannot lie," this expres-
sion of opinion would be so clearly erroneous as to leave
no room for argument in its support.    We have no thought
that the court intended to convey this idea, but it remains
true that such is not an entirely unnatural paraphrase of
its language, and such, we think, would be its weight and
effect upon the mind of the average juror.    It is a holding
up of one kind or class of evidence in contrast with an-
other; one being given the merit of absolute verity, and
the other discredited by the possibility, if not, indeed, the
suspicion, of falsehood.    In other words, we think the
jury could hardly fail to understand from this charge that,
as a matter of law, or in the opinion of the court, the cir-
cumstancial evidence to which they had listened was of
greater weight and of more convincing force than the

direct evidence. In states having a statute like our own it has frequently been held that the charge of the court should be entirely free from any suggestion as to the weight of evidence. *People v. Cowgill*, 93 Cal. 596 (29 Pac. Rep. 228); *Andrews v. People*, 60 Ill. 354; *Berry v. State*, 10 Ga. 511; *Walker v. State*, 42 Tex. 360; *Johnson v. State*, 1 Tex. App. 609; *White v. Territory*, 3 Wash. 397 (19 Pac. Rep. 37); *Cunningham v. State*, 65 Ind. 377. Reference to any particular fact or kind of evidence as being "strong" or entitled to "great weight" has often been held error. *Steele v. State*, 83 Ala. 20 (3 South. Rep. 547); *People v. Ah Sing*, 59 Cal. 400; *Boyer v. State*, 93 Tenn. 216 (23 S. W. Rep. 971). A charge to the jury that "law writers say that a chain of circumstances cannot lie, while a witness may," has been held error upon the ground we have above suggested, as being calculated to impress on the minds of the jury the suspicion that defendant's witnesses have sworn falsely. *Cicero v. State*, 54 Ga. 156. See, also, *Harrison v. State*, 8 Tex. App. 183; *Harrison v. State*, 9 Tex. App. 407. Irrespective of the question whether this charge invades the province of the jury, we cannot indorse the proposition that, while "witnesses may falsify, circumstances cannot," and, "while men may commit perjury, a fact cannot." To speak of independent facts and circumstances as "testifying" is perhaps an allowable figure of speech, but the testimony consists wholly of the inferences or deductions which the jurors draw from them, and these may be correct or incorrect, "true" or "false." Furthermore, we must rely upon the testimony of witnesses as to the very existence of such facts and circumstances, and thus to the possibility of wrong inference we add the possibility of perjury or mistake in the premises from which the inference is drawn.

We do not disparage circumstantial evidence. It is legal evidence, the value and necessity of which are beyond question; but the point we wish to emphasize is that

the matter of its weight and its influence upon the verdict in any given case is for the jury alone, and the court should not, by its instructions, appear to draw a comparsion or contrast between the two classes of evidence to the discredit of either.  Indeed, the value of evidence, its conclusiveness  or  inconclusiveness,  depends not  upon its being either direct or circumstantial, but upon the manner in which it appeals to the candid judgment of the impartial juror honestly and intelligently seeking the truth.  If, upon such an investigation of the entire case as made upon the trial, he is convinced of the guilt of the accused to a moral certainty, "beyond a reasonable doubt," then his verdict should be returned accordingly, without reference to whether that conviction has been produced in his mind by direct or circumstantial evidence.  *State v. Seymour, supra; State v. Rome,* 64 Conn. 329 (30 Atl. Rep. 57;) *Mickle v. State,* 27 Ala. 20; *Moughon v. State,* 57 Ga. 102.  Neither kind of evidence is infallible.  Each has its inherent elements of strength and of weakness.  Their relative weight and value are not matters of law to be settled by the court.  These will naturally vary in different cases, and must be left to the determination of the jury.  The only precedent in our own decisions which may be thought to sustain the declaration of the trial court now under consideration is in *State v. Moelchen, supra,* where the statement that "strong circumstantial evidence in cases of crime is often the most satisfactory," and that witnesses testifying to a "direct fact may be guilty of perjury," and that, "to use a trite expression, circumstances will not lie," was, without discussion, held not to be objectionable.  In the sense, if so intended, that "circumstances" cannot consciously utter a falsehood, this is, of course, true, and such we must conclude is the meaning there placed upon the instruction; but we are strongly impressed that such is not the significance which the average juror would find in the language of the trial court,

but would rather conclude therefrom that the inferences to be drawn from incriminating circumstances are infallible, or at least of decidedly greater weight and certainty than the direct testimony of witnesses.

VII.    In the nineteenth paragraph of the charge the court admonished the jury of the important, and responsible character of its duties, and among other things said:

9. INSTRUCTION: conviction and acquittal. "On the one hand, you should remember that a failure to perform your duty, by which a crime, if one is shown, might go unpunished, and a criminal escape the penalty of his crime, cannot be corrected by a new trial, for the defendant cannot twice be put in jeopardy under our law.    The state demands and has a right to ask at your hands the full performance of your duty in the enforcement of the law, and no notions of mere sympathy or sentimentality should cause you to hesitate in the performance of your full duty.    And, on the other hand, you should never for a moment forget your duty to secure and protect every right guarantied by the Constitution and our law, to the defendant.    You should not allow any outside influence or pressure, or indignation at the crime, or sympathy for the victim or her relatives, to influence you in finding a verdict in this case."    An instruction in substantially the same language was before us in *State v. Hunter*, 118 Iowa, 686, and by a majority of the court held to be erroneous.    That case was so recently decided we think it unnecessary to re-enter upon a discussion of the question thus presented.    The majority remain satisfied with the conclusion reached in that opinion, and think the giving of this instruction was prejudicial error.

Other questions discussed are not likely to arise upon a retrial, and we do not consider them.

For the reasons stated, the judgment below is reversed, and the case remanded to the district court for a new trial.—REVERSED.