[No. 40974.    En Banc.    September 17, 1970.]

*In the Matter of the Application for a Writ of Habeas Corpus of* JOHN WILLIAM HAWKINS, *Petitioner,* v. B. J. RHAY, *as Superintendent of the State Penitentiary, Respondent.**

*Reported in 474 P.2d 557.

*Michael H. Rosen* and *John M. Junker,* for petitioner.

*The Attorney General* and *Stephen C. Way, Assistant,* for respondent.

HAMILTON, J.—The petitioner, by way of habeas corpus, seeks to have a verdict and sentence of death imposed upon him set aside. He contends that the process of selecting the jury violated his right to an impartial jury within the contemplation of the sixth and fourteenth amendments to the United States Constitution, as those amendments have been interpreted and applied by the United States Supreme Court in the cases of *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), and *Boulden v. Holman,* 394 U.S. 478, 22 L. Ed. 2d 433, 89 S. Ct. 1138 (1969).

Petitioner was charged in Clark County, Washington, with two counts of murder in the first degree in connection

with the brutal slaying of two minors. He entered pleas of not guilty and not guilty by reason of insanity or mental irresponsibility as to each count. Trial before a jury was held in May, 1965, and he was found not guilty by reason of insanity or mental irresponsibility on the first count and guilty on the second count. The jury recommended the death penalty with respect to the second count finding.

On appeal, this court affirmed the resultant judgment and sentence. *State v. Hawkins,* 70 Wn.2d 697, 425 P.2d 390 (1967), *cert. denied,* 390 U.S. 912, 19 L. Ed. 2d 883, 88 S. Ct. 840 (1968). Subsequently, the United States Supreme Court rendered its decision in *Witherspoon v. Illinois, supra,* and this petition followed.

There is no question before us as to petitioner's guilt of the murder as charged in the second count. Our sole inquiry is directed to the question of whether, at the time of trial, prospective jurors were improperly excused for cause on voir dire examination because of their reservations concerning capital punishment.

On the morning trial commenced, a panel of 61 veniremen[1] reported and assembled in the courtroom. Twelve prospective jurors were drawn and took seats in the jury box. All veniremen were then sworn and advised by the court of the charges against the defendant and his pleas thereto. Four jurors were immediately excused because of preconceived opinions concerning guilt or innocence. Upon their replacements being seated in the jury box, the trial judge, with the concurrence of the prosecuting attorney addressed the following remarks to the jury panel and to those seated in the jury box:

Ladies and gentlemen of the jury, this being a charge of first degree murder, as known under our State laws as a capital case, and the maximum punishment in such a case, if the accused is found guilty and it may be so determined by the jury, that the death penalty may be inflicted. This is known as capital punishment. Is there any member of this jury, or in the jury box, who does

---

[1]The record before us does not reveal the total number of veniremen on the panel; however, counsel for the state in oral argument indicated the number to be 61.

not believe in, or who we'll say believes against capital punishment?

Apparently at this point some 12 prospective jurors raised their hands, three of whom were seated in the jury box. The trial judge then directed his next remarks to those in the jury box and the following colloquy took place:

Now this is the law of this State, and you'd feel that even though it is the law that you could not follow this law, is that correct, Mrs. Wolfenbarger? MRS. WOLFENBARGER: Yes. THE COURT: And Mrs. Pace, is this your belief also? MRS. PACE: Yes. THE COURT: And Mr. Levanen, is this your belief, you're opposed to capital punishment? MR. LEVANEN: Yes. THE COURT: Do you care to interrogate further on this, Mr. Jones? MR. JONES: No, if they've indicated this is a matter which for any reason they are opposed to as a matter of their policy—it is the law of this State, and of course if they could not follow the law then they would not qualify as jurors. THE COURT: Do you wish to interrogate Mrs. Wolfenbarger? MR. LA-LONDE: No, your honor. MR. JONES: I think she would have to be excused your honor. THE COURT: Mrs. Wolfenbarger may be excused. Mrs. Pace may be excused, and Mr. Levanen may be excused.

Three replacements were then drawn, one of whom, a Mrs. Helen E. Bakker, indicated reservations concerning capital punishment. At this point, and as a prelude to examining Mrs. Bakker on voir dire, the prosecuting attorney stated:

MR. JONES: I don't know how many of the people back here raised their hands. Mrs. Bakker, or any of you other people I wish you'd follow along. If you have because of a religious belief, or otherwise, any feeling that you could not sit on the case with an open mind that might involve this problem—that's something of course that can't be determined until the case has been fully presented to you.

The voir dire examination of Mrs. Bakker proceeded, as noted in the margin,[2] and culminated in the following question, answer, and disposition:

---

[2]"BY MR. JONES: Q. But the question is, Mrs. Bakker, assuming that this case has been tried, and you came to the point in the case where this matter of the law of this State would need to be considered

Q. Well Mrs. Bakker, let me point it up to you this way, all of us may have some differences in our minds about what the law ought to be on some subjects. It might be that they ought to put a notice on cigarettes, or not, you see, that they're dangerous, something of this sort. Now a part of the law of the State of Washington is that capital punishment may be the punishment, but the jury decides that. You may never come to the point here —you may come to the point, but at this time we have to know if you did, whether or not withstanding your opinion as to what you think the law ought to be, whether you could objectively approach that problem of consideration in connection with the evidence as you found it to be, and the facts as you found them to be, or whether you would then not be able to go on as a juror and say, "No, I just can't consider that."? A. That's right, I just don't think I would have an objective opinion on that point. MR. JONES: In that case, your honor, we would have no objection to excusing Mrs. Bakker. THE COURT: Do you, Mr. LaLonde? MR. LALONDE: No, we have no objection. THE COURT: In that case we'll excuse Mrs. Bakker. Call another juror please.

The voir dire examination thereafter proceeded through some 10 prospective jurors without further reference to capital punishment, until the name of Mrs. Susie Jenner was drawn when the following occurred:

---

by the jury, does your attitude in connection with capital punishment for murder in the first degree—is it such that you could not fairly and objectively consider that as a juror? A. No, I just don't believe that in good conscience I could say that the punishment should be death. Q. Well you understand it's the law of this State? A. Yes, I understand that. Q. All right, now the question is whether you as a juror have because of your state of mind about this matter—and there are people of course who have different ideas about it—whether it's not simply that you have an idea that is contrary to it, but whether that idea is such that you could not put your own idea aside, and then approach the problem on the basis of the facts and the evidence that you would be confronted with in this case? Do you follow—if you came to that matter for consideration itself, Mrs. Bakker, is your feeling about it such that you couldn't give it, notwithstanding your own ideas maybe what you thought the law ought to be, that you could not give it fair consideration in the light of the evidence, and under the evidence? A. Well as I understand, I just don't think that I would have an objective opinion when it came to deciding whether to punish—the punishment should be death or not."

MRS. JENNER: I had already expressed myself as not being in favor of capital punishment. THE COURT: Any objection to excusing Mrs. Jenner? MR. JONES: No objection. MR. LALONDE: No objection. THE COURT: Call another juror. Thank you. CLERK: No. 23, Russell Eplay. THE COURT: Pardon me, had you indicated anything about the question of capital punishment? MR. EPLAY: I don't believe in it. THE COURT: I thought he had raised his hand, but I—MR. JONES: Yes, I had made a note of Mr. Eplay. THE COURT: You may be excused then. Call another juror.

After 12 prospective jurors were otherwise passed for cause, the defendant through his counsel exercised 7 of his 12 peremptory challenges. During the course of the voir dire examination of the veniremen drawn as replacements, two more prospective jurors—Mr. Lee A. Hildebrand and Mrs. Louise Bakke—were excused for cause, in the following manner:

THE COURT: . . . Call another juror. CLERK: No. 38, Lee A. Hildebrand. MR. HILDEBRAND: Your honor, I have raised my hand, I'm very much opposed to capital punishment. THE COURT: All right, thank you. Call another juror, please. . . . THE COURT: Call another juror. CLERK: No. 6, Louise Bakke. MRS. BAKKE: Your honor, I was one that was against capital punishment. THE COURT: Thank you. Mrs. Bakke is excused, call another juror.

A jury of 12 and 2 alternates was thereafter seated.

In summary, 35 members of the 61 member panel were drawn and examined on voir dire. Eight, or approximately 25 per cent of those drawn, were excused for cause in the manner heretofore set forth. Six were excused for cause on other grounds, and seven were peremptorily challenged by the defendant. The prosecuting attorney did not exercise any of the state's 12 peremptory challenges. The names of the additional four members of the panel who raised their hands in response to the trial judge's preliminary question concerning capital punishment were not drawn.

In *State v. Smith,* 74 Wn.2d 744, 446 P.2d 571 (1968); *State v. Aiken,* 75 Wn.2d 421, 452 P.2d 232 (1969); and *State v. Adams,* 76 Wn.2d 650, 458 P.2d 558 (1969), we

noted the holding summarized in *Witherspoon v. Illinois,* 391 U.S. 510, 521-22, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968):

Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.

Amplification of this holding is found in note 21 of the opinion, at pages 522-23, wherein the court observed:

Just as veniremen cannot be excluded for cause on the ground that they hold such views, so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him. The most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law, and that he not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings. If the *voir dire* testimony in a given case indicates that veniremen were excluded on any broader basis than this, the death sentence cannot be carried out even if applicable statutory or case law in the relevant jurisdiction would appear to support only a narrower ground of exclusion. . . .

We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.* Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction,* as opposed to the *sentence,* in this or any other case.

By way of further elucidation and in stressing the need for clarity in this area of the voir dire examination of prospective jurors, the court pointed out in note 9 of the opinion, at page 516:

Unless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal, it simply cannot be assumed that that is his position.

The underlying theme of *Witherspoon,* as we read it, is that citizens who entertain reservations about capital punishment, but who nonetheless can subordinate their personal views to their obligation as a juror and weigh the penalty issue in a proper case, constitute a significant segment of the community within the concept that a jury shall be drawn from a cross-section of the community. It follows from this, in the eyes of *Witherspoon,* that a systematic and indiscriminate exclusion for cause of such citizens from jury service in a capital case violates a defendant's constitutional right to a fair, impartial, and representative jury upon the issue of penalty. If, then, prospective jurors are to be challenged and excused for cause because of their views concerning capital punishment, it is essential that the basis of their disqualification be clearly established upon the voir dire examination, and preserved in the record for appellate review.

Measured against the thesis and the rather rigid requirements of *Witherspoon,* we are satisfied that the voir dire examination we have referred to above does not make it unambiguously and unmistakably clear that the eight prospective jurors excused for cause because of their views on capital punishment were excused because they would irrevocably and automatically vote against the death penalty regardless of what the evidence at trial might reveal.

In no instance, with the possible exception of Mrs. Bakker the fourth juror to be excused, were the depths or dimensions of a prospective juror's feelings concerning capital punishment adequately explored. The first three were excused after indicating generally they could not follow "this law," against the backdrop of a rather terse and some-

what vague explanation of a juror's duties in a capital case, coupled to a general question as to who among the panel "does not believe in, or who we'll say believes against capital punishment." The last four were excused without further questioning simply because they said either they were not in favor of capital punishment (Mrs. Jenner), did not believe in it (Mr. Eplay), were very much opposed to it (Mr. Hildebrand), or were against it (Mrs. Louise Bakke). And, in Mrs. Helen E. Bakker's voir dire examination, it remains ambiguous as to whether she was excused because she could not be "objective" about capital punishment or because her beliefs were so deep-seated that she could not consider the issue. The overall tone and pattern set by the disqualification of these prospective jurors for cause, based upon their general responses to the questions asked, virtually savor of a systematic exclusion.

In *State v. Aiken, supra,* after noting that our prior decisions in this field of challenges for cause were in harmony with *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), we observed that, in meeting the demands of *Witherspoon,* as well as our prior holdings, it was not necessary to engage in a formulistic dialogue with a prospective juror on voir dire examination. Nevertheless, we endeavored to emphasize the proposition that before a prospective juror is disqualified for cause due to his beliefs with regard to capital punishment, it is essential that such dialogue as is carried on in this respect be sufficient in depth and/or in a context as will unequivocally and unmistakably establish that the prospective juror's opposition to the death penalty is in fact such as would preclude him from imposing that penalty under any circumstances, or would prevent him from making an impartial determination upon the issue of guilt. Anything short of this cannot be squared with *Witherspoon.*

This was not done in the instant case, and we are compelled to the conclusion that the eight jurors in question were improperly excused for cause to the detriment of defendant's constitutional rights as enunciated by the United States Supreme Court in *Witherspoon* and *Boulden*

*v. Holman,* 394 U.S. 478, 22 L. Ed. 2d 433, 89 S. Ct. 1138 (1969).

■ The state contends, however, that because the prosecuting attorney did not utilize any peremptory challenges it can be assumed that these jurors would have been so challenged and excused had the trial judge declined to excuse them for cause; hence, the defendant was not prejudiced. In this respect the state points to *State v. Mathis,* 52 N.J. 238, 245 A.2d 20 (1968). Chief Justice Weintraub, speaking for the New Jersey Supreme Court in the cited case, characterized such a contention as "relevant makeweight," and added it to a finding by the court that the prospective jurors excused in that case had been properly questioned and disqualified. We too believe the argument to be relevant makeweight, under appropriate circumstances; however, it is fraught with too many speculative factors to constitute the sole basis upon which to justify noncompliance with the thesis of *Witherspoon.*

■ Next, the state asserts that the duty rested upon the defendant to probe the prospective jurors' beliefs and to object to their excusal if they were properly qualified, and his failure so to do negates a denial of due process. Under the circumstances here present, we cannot agree with the state's argument. In the first place, the prospective jurors were excused for cause at the state's behest, and it was the state's obligation to lay the proper grounds for their disqualification. This was not done, and it was not up to the defendant to shore up the state's challenge or to interrogate them for the purpose of requalifying them. And, in the second place, the trial in this cause was conducted prior to the dissemination of the *Witherspoon* decision, and all trial counsel and all trial judges were not fully aware of the grave constitutional implications imported by *Witherspoon* into the disqualification of prospective jurors on the grounds of conscientious scruples regarding capital punishment. This being the situation, we cannot concur in the argument that the defendant's failure to interrogate the prospective jurors and object to their dismissal negates the

constitutional guarantees retroactively afforded him by *Witherspoon. Cf. Boulden v. Holman, supra.*

■ Finally, and alternatively, the state asks that the cause be remanded for an evidentiary hearing upon the question of whether the excused jurors entertained views at the time of trial consistent with a proper disqualification. The state cites no precedent for such a procedure, and we seriously question the efficacy and reliability of such a hearing at this late date. Approximately 5 years have elapsed since the events in issue occurred and, aside from the fact that counsel in oral argument indicated that not all eight of the jurors involved were presently available, it is doubtful that those who are available could fairly and accurately recall and relate what their views on capital punishment actually were on the date of their voir dire examination. Certainly it is possible, if not probable, that their views have changed in one form or another in the meantime, and their testimony on the question now could easily, though perhaps not consciously, be influenced by such a change in their attitude.

We find no merit in this request.

■ In conclusion, upon this facet of the case, it is our view that *Witherspoon* compels the vacation of the sentence of death heretofore imposed upon the defendant, and that the cause be remanded for a new trial upon the issue of penalty. The finding of guilt and the degree of the crime stands.

In view of the fact that this disposition of the cause projects a separate trial upon the issue of penalty only, we deem it appropriate to comment briefly upon the authority therefor and the procedural aspects thereof.

Although the legislature has not specifically erected a statutory framework for bifurcated trials as such, it has, in connection with murder charges, sanctioned a trial limited to the determination of the degree and the punishment, where the accused pleads guilty to such a charge. RCW 10.49.010; *State v. Davis,* 6 Wn.2d 696, 108 P.2d 641 (1940). The legislature by that statute implicitly recognized that, in an appropriate case, there could be a jury trial upon the

issue of punishment alone. *State v. Todd,* 78 Wn.2d 362, 474 P.2d 542 (1970). We believe this to be such a case.

We have carefully perused the provisions of the proposed draft of the Model Penal Code submitted to the American Law Institute and the statutes of the State of California (Cal. Penal Code § 190.1 (West Cum. Supp. 1968)) and New York (N.Y. Penal Law § 125.35 (McKinney 1967)) as they relate to separate jury trials concerning the issue of punishment in capital cases. Though we recognize that these references are not controlling in this state, nevertheless they do project what appear to be presently acceptable and reasonable, although general, guidelines concerning the scope of the evidence adducible at a penalty hearing. *See also* 40 Am. Jur. 2d § 555.

■ In essence, and drawing upon the foregoing sources for guidance, we hold that at a separate penalty hearing, such as here ordered, relevant evidence may be presented concerning the nature and circumstances surrounding the offense involved, the defendant's background and history, and any facts or circumstances in aggravation or mitigation of the crime and the penalty. The evidence must, however, be competent, not unduly prejudicial or inflammatory, and cannot be directed solely to impeachment of the prior adjudication of guilt.

Evidence regarding the probability of early parole or the possibility of intervention by executive clemency shall not be admitted. *State v. Todd, supra.* Likewise, evidence concerning the deterrent effect of one form of penalty as opposed to another shall not be received. *People v. Love,* 56 Cal. 2d 720, 366 P.2d 33, 809, 16 Cal. Rptr. 777, 17 Cal. Rptr. 481 (1961); *People v. Kidd,* 56 Cal. 2d 759, 366 P.2d 49, 16 Cal. Rptr. 793 (1961); *People v. Ketchel,* 59 Cal. 2d 503, 381 P.2d 394, 30 Cal. Rptr. 538 (1963).

■ The state will be permitted to proceed with its evidence first in order and thereafter will be limited to rebutting any new matter introduced by the defendant. The defendant may but need not take the stand on his own behalf. Final summations to the jury shall be presented in the same sequence as the order of proof.

The jury, by appropriate instructions, shall be informed that in this state the penalty for the crime of murder in the first degree is life imprisonment, unless the jury determines that the punishment shall be death; that imposition of the death penalty in the case before it lies within the conscience and sound discretion of the jury; that in arriving at its determination upon the penalty issue, the jury shall weigh and evaluate all of the evidence presented to it bearing upon the nature and circumstances surrounding the crime, the defendant's background and history, and the facts or circumstances in aggravation or mitigation of the crime and the punishment; that based upon such evidence the jury in arriving at its decision is entitled to consider the nature of the crime involved, the defendant's guilt thereof, his potential for reformation and rehabilitation, society's need for protection from his future behavior, and the furtherance of the interests of justice; and that the maximum penalty shall not be invoked in a spirit of vengeance or inflicted solely to exact retribution.

The special verdict form submitted to the jury shall be so phrased as to require an affirmative recommendation of the death penalty and the jury's verdict in this respect must be unanimous. In the event the jury is unable to agree upon the issue of penalty, the trial court shall discharge the jury and impose a sentence of life imprisonment.

The cause is accordingly remanded to the Superior Court for Clark County for further proceedings consistent with this opinion; provided, however, the state, for good cause shown and subject to approval of the superior court, may elect to forego further proceedings, in which event a sentence of life imprisonment shall be imposed.

FINLEY, ROSELLINI, NEILL, and McGOVERN, JJ., concur.

FINLEY, J. (concurring)—I believe that it should briefly be emphasized that *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), *Boulden v. Holman*, 394 U.S. 478, 22 L. Ed. 2d 433, 89 S. Ct. 1138 (1969), and the most recent case, *Maxwell v. Bishop*, 398 U.S. 262, 26 L. Ed. 2d 221, 90 S. Ct. 1578 (1970), made little if any

change in substantive Washington law concerning challenges for cause in capital cases. The pertinent Washington statutory provision, RCW 10.49.050, provides:

> Challenge for cause—Capital case—Conscientious scruples. No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be compelled or allowed to serve as a juror on the trial of any indictment or information for such an offense.

We have interpreted the statute several times. Under our cases the statute seems to require more of an inquiry into the opinions of potential jurors than occurred with some of those jurors in the instant case. In each case where the voir dire has been set out and its substance is apparent a more thorough investigation of conscientious scruples occurred than in the instant case. *See, e.g., State v. Riley,* 126 Wash. 256, 218 P. 238 (1923), which approved the following line of questioning:

> "Q. If, in your judgment, the circumstances of a case should warrant it, could you vote to hang a man as a penalty for murder? A. No, sir. Q. Under no circumstances? A. No, sir. Q. No matter what the evidence might show? A. No, sir. Q. Nor how aggravated the case? A. I could not."

*See also State v. Leuch,* 198 Wash. 331, 88 P.2d 440 (1939), wherein the voir dire included the following:

> "Q. Mr. Reader, have you any conscientious scruples against the infliction of the death penalty in cases of murder in the first degree? A. Well, yes. Q. You have? A. Yes."
>
> ". . ."
>
> "Q. Mr. Reader, are your objections such that under no conditions as presented to you that you could not return the death penalty? A. Well, I just don't feel that I have the right to do that. Q. You feel that you have not the right in any case? A. No, I don't."

Thus, under our statute as construed in the above cases, jurors are excludable on virtually the same basis as under *Witherspoon, Boulden,* and *Maxwell.* Those cases clearly seem to hold that jurors who have reservations but would

impose the death penalty under the evidence and the law in an appropriate case may not be excluded, and if they are the death penalty may not be imposed. Just as clearly, the decisions hold that jurors may be excluded without prejudice to the accused if they are absolutely opposed to the death penalty, and would automatically vote against its imposition no matter what the circumstances. Nothing in the cases turns on the *number* of jurors excluded.

For the reasons indicated, I concur in the views expressed by Hamilton, J., in the majority opinion.

HALE, J. (dissenting)—A criminal trial is a search for the truth conducted according to established rules and procedures. One accused of crime has a right to know not only whereof he stands charged but the rules under which he will be tried. The people, too, in the exercise of their sovereign power to maintain the public peace and safety have a right to advance notice of the rules and procedures with which they are required to comply. It now appears that, while the accused retains these rights, the people have lost them. The most scrupulous adherence to established rules and judicial precedent by the judges and the people's counsel no longer gives assurance that the verdict and judgment thereon will be held to speak the truth. Time never runs out in criminal cases on the opportunity for appeals, reviews, remands and collateral attacks.

Our judicial systems, upon which individual liberty and public safety so largely depend, give recurring evidence of resting on shifting sands. A trial record singularly free of error, showing due process of law, and demonstrating the most faithful compliance with time-tested, court-tested statutes, rules and precedents means little more today than that one has been accused, arrested, tried, convicted and sentenced in passing from one appeal and review to another. Though due process be provided to the costliest detail and the rules of evidence most painstakingly observed and all appellate procedures consummated in an ultimate affirmance, a case may nevertheless be reviewed again and again throughout the legal systems and appellate super-

structure to wind up as no more than a prolonged forensic contest.

Stability and precision, never perfectly attained in law but long and vigorously sought by the courts, have, I fear, given way to judicial whim and caprice. The quest for stability and precision, in my judgment, has been supplanted by an inconstant appellate-prescribed modus operandi having little more than coincidental connection to the state and federal constitutions, and in which doctrines, principles and rules may be changed, abrogated or invented as the trial progresses or long after it has ended. It frequently turns out that failure to observe a rule discovered, invented or declared long after trial may constitute reversible error though neither the court nor the prosecution nor the accused could possibly have recognized the error during or after the trial.

Centuries of evolutionary development have imparted to our judicial systems the qualities of high tensile steel, giving them the strength and resilience to withstand the external forces and pressures exerted by a turbulent and ever-changing democratic society. A continuous process of intellectual annealing has given them the strength and flexibility to discharge, if not perfectly at least creditably, the sovereign judicial power. But historically the pressures have been external, operating with varying force upon the outside of the judicial structure. Now we are faced with new pressures in the criminal law generated with unprecedented power, working upon the judicial systems from within and toward unforeseeable ends. Even as high quality steel cannot withstand disruption of its molecular structure, the judicial systems, I fear, may lack the resilience to survive the enormous internal forces generated by ever-changing, shifting, newly-declared propositions inconstantly applied.

The judicial power cannot be exercised under the constitutions except through rules of procedure ascertainable in advance of trial. The whole judicial process depends upon an orderly inquiry, conducted according to preascertained and declared principles; it represents a culminating

triumph of order, reason and experience over caprice, disorder and emotion. Although the truth might lie in chaos, the courts are unequipped to seek it there.

The procedures now adopted by this court will, I think, contribute to the quiet quality of chaos which I perceive to be slowly suffusing the administration of criminal justice in this country. They not only exceed the court's statutory and constitutional powers to adopt, but, of equal consequence, will retard the search for the truth in criminal cases. To establish bifurcated trials in capital cases without legislative sanction, and to do so retroactively upon a judgment and sentence which became final years ago, this court has to actually extend the subtleties and vagaries of the rationale of *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), and *Boulden v. Holman*, 394 U.S. 478, 22 L. Ed. 2d 433, 89 S. Ct. 1138 (1969). Those decisions, as now applied, leave the trial courts of this state in a perpetual quandary. How can the superior court select an impartial jury in capital cases in accordance with the nebulous standards now imposed without conducting an inquiry which will impart more prejudice than it elicits, and avoid prolonging the jury selection procedure to disastrous lengths? The court's opinion demonstrates once again the enormous power of judicial caprice in shaping the judicial structure. I therefore dissent.

I

PETITIONER WAS CONVICTED
UNDER DUE PROCESS OF LAW

The trial record, I believe, establishes that petitioner was convicted under the highest and most vigorously applied standards of due process of law, and that the evidence of his guilt was overwhelming. On the night of December 10, 1964, he murdered Frederick Walch, age 16, and Frederick's sister, Bonnie Lee Walch, age 17. He beat Frederick in the head with a hammer as the boy lay on his bed in a basement area, fracturing his skull in at least four places. Then, since death was not immediate, Hawkins caused his victim's death by slitting his throat so that the youth died

from drowning in his own blood. He pulled the bed covers over the dead boy so that the body was not exposed.

On count 1, charging the murder of Frederick Walch, the jury returned a special verdict that Hawkins committed the crime; that he was mentally irresponsible or insane at the time of its commission; that the mental irresponsibility or insanity did not continue to exist at the time of trial; but that there was such a likelihood of a relapse or recurrence of the insanity or mental irresponsibility that petitioner was unsafe to be at large. This finding of temporary insanity is consistent with the evidence that he may have murdered the youth while under the brief effect of some drug, or while caught up in a sudden violent reaction of anger to the remarks which the boy made.

Hawkins killed Bonnie Lee some time later, striking her in the head with a hammer and then stabbing her through the heart with a knife. From evidence of Hawkins' actions and conduct following the killing of Frederick, the jury found that he had recovered his sanity when he attacked Bonnie Lee and that he killed her by design and with premeditation.

In his statements to police officers, Hawkins showed good mental recall of his actions and events after he had killed the boy. He remembered that Frederick and Bonnie Lee had quarreled with him for living off their mother. He told the officers that he followed Freddie to the basement, saw the boy sit on the bed and remove his shoes, and that he then hit him with the hammer. He then went back upstairs and sat down to have a cup of coffee. Thus, the record bears out that, during a substantial time interval between the first and second murders, Hawkins changed his clothes and drank coffee for a while.

There was evidence that Bonnie Lee, unaware of the murder of her brother, talked to Hawkins and upbraided him again for living in their house and shortly thereafter that she then went to her bedroom in the basement. Hawkins followed her there. When she turned on the bedroom light, he hit her in the head with a hammer.

Psychiatric testimony and other evidence enabled the

jury to find that, during the lapse of time between the first killing and the second, and while he changed clothes and drank coffee, the toxic effects of whatever drugs Hawkins claimed to have taken or the temporary insanity possessing him when he murdered the boy, had worn off.

Carol Walch, mother of the two children, returned home sometime after 1 a.m., December 11, 1964. She went first into the kitchen and then into her bedroom where she lay down across the foot of the bed. Hawkins followed her and said, " 'I guess you don't want me around here anymore?' " She acknowledged this to be true and told him that his presence caused too much trouble with the children. She testified that he replied to the effect that they would not bother her any more and then he stood up and said, " 'You better call the police,' " and, according to her testimony, "He walked to the living room, grabbed his coat, and went out the front door."

Alarmed at this remark and his demeanor, Mrs. Walch went to the children's rooms, found her children dead and ran to the neighbors', who called the police at about 1:30 a.m.

From proof of defendant's actions after the killings, the jury had further evidence from which to find him mentally responsible when he murdered the girl. There was evidence that he stole a car, drove north in it and abandoned it south of Chehalis. He had a rational conversation with a service station operator there and then hitched a ride on a beer truck to Seattle. Later that evening, en route out of the country to Canada, a border patrol officer, acting on a circulated police bulletin, intercepted and apprehended him. He was taken from Blaine to the Whatcom County jail at Bellingham and put in custody of an officer from the Vancouver Police Department.

This court affirmed the judgment and sentence. *State v. Hawkins*, 70 Wn.2d 697, 425 P.2d 390 (1967), and the Supreme Court of the United States denied certiorari, 390 U.S. 912, 19 L. Ed. 2d 883, 88 S. Ct. 840, by order of January 22, 1968. One would think that the denial of certiorari

would end the matter except for possible executive clemency.

Neither during trial nor on appeal to this court did the defendant complain of or assign error to the manner and method in which the jury which tried him had been drawn and impaneled, or intimate that the jury had been unfairly examined, selected or constituted. He used only 7 of the 12 peremptory challenges available to him. The entire 153 pages of the statement of facts devoted to the voir dire examination of the jury are completely free of error; they contain no challenges to the array nor any objections whatever to the venire, the method of selecting a jury, or even a suggestion that the accused considered any phase of impaneling the jury unfair or prejudicial.

Now, after all avenues of appeal have been exhausted and certiorari denied by the Supreme Court of the United States, and nearly 6 years after the commission of the two murders, this court—in a collateral proceeding, acting under what I consider to be the most vague and illusory notions of stare decisis—not only grants one half a new trial, but exceeding, I think, its constitutional powers, improvises a novel procedure in doing so. The petitioner, I think, has no true remedy left him but to seek executive clemency, and I therefore dissent both to granting petitioner a new trial and also to the kind of half trial authorized.

Neither the rationale of *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), nor *Boulden v. Holman*, 394 U.S. 478, 22 L. Ed. 2d 433, 89 S. Ct. 1138 (1969), upon which the court depends, in my opinion warrants a granting of the petition at all, much less supports a remand for what is now unhappily becoming known by the curious name of bifurcated trial, *i.e.*, a retrial on the sole issue of the death penalty.

The statutes and procedures governing the selection and impaneling of juries in those cases differ so markedly from the statutes of this state and the procedures followed in selecting the Hawkins jury that those cases can hardly be regarded as supporting this court's present course. As cited

in *Witherspoon,* the Illinois statute,[3] unlike those controlling selection of the Hawkins jury, provided that a juror could be challenged for cause and dismissed merely if he said (1) that he had conscientious scruples against capital punishment or (2) simply that he was opposed to capital punishment. The Supreme Court, as I understand its opinion, decided to reverse in *Witherspoon* on the premise that, in picking the jury according to that statute, the deck not only could be but in fact had been stacked against the accused. It emphasized that "the tone was set when the trial judge said early in the *voir dire,* 'Let's get these conscientious objectors out of the way, without wasting any time on them.' [391 U.S., at 514]" It reports that in rapid succession 47 veniremen were successfully challenged for cause and dismissed on the basis of their indeterminate attitudes against the death penalty. Not more than four of the 47 explicitly stated that under no circumstances would they vote to impose capital punishment, yet all 47 were, nonetheless, excused. Only one venireman, admitting to a religious or conscientious scruple against the death penalty, was examined at length; she finally was ruled disqualified and told by the court to step aside. But despite what appears in *Witherspoon* to be a summary discharge of jurors based frequently on only vague and indefinitely expressed ideas against the death penalty, the court, in commenting on the propensity of some jurors to inflict the death penalty, said, at page 518:

> In light of the presently available information, we are not prepared to announce a *per se* constitutional rule *requiring the reversal of every conviction returned by a jury selected as this one was.*

(Italics mine.) The *Witherspoon* opinion thus turns upon the stated conclusion reached by the Supreme Court that the "state of Illinois has stacked the deck" against the defendant. Having reached that conclusion, the court had

---

[3]"In trials for murder it shall be a cause for challenge of any juror who shall, on being examined, state that he has conscientious scruples against capital punishment, or that he is opposed to the same." Ill. Rev. Stat., c. 38, § 743 (1959).

no choice but to grant the accused a new trial. No such bizarre conclusion, however, could possibly be drawn from the Hawkins trial record—a record showing in detail a careful, circumspect and conscientious effort to select a fair and impartial jury.

*Witherspoon* thus supplies a most unsubstantial basis for granting a new trial. It is of equally doubtful authority on the question of limiting the new trial to the issue of punishment. The Supreme Court, both in the rationale and in the decree, set forth in the opinion a categorical judgment of reversal and directed a new trial. Were it not for an annexed footnote comment,[4] the case, in the ordinary course of procedure, would have gone back to the trial court for a new trial on all issues. Thus, it is not the ruling of *Witherspoon*—but rather a footnote stating that the opinion did not in that or any other case render invalid the conviction, as distinguished from the actual sentence—which suggests the pattern now adopted by this court. Without that footnote, the opinion contains no authority—nor in the absence of statute does one exist generally in constitutional law—empowering this court to ordain a separate jury and separate trial on the issue of the death penalty.

The other case relied upon by the court, *Boulden v. Holman,* 394 U.S. 478, 22 L. Ed. 2d 433, 89 S. Ct. 1138 (1969), does not, in my view, warrant the novel course on which the court now embarks. Although the court concluded in *Boulden* that the sentence of death could not constitutionally stand, it acknowledged, at page 484:

> We do not, however, finally decide that question here, for several reasons. First, the *Witherspoon* issue was not raised in the District Court, in the Court of Appeals, or in the petition for certiorari filed in this Court. A further hearing directed to the issue might conceivably modify in some fashion the conclusion so strongly suggested by the record now before us. Further, it is not clear whether the

---

[4] ". . . Nor does the decision in this case affect the validity of any sentence *other* than one of death. Nor, finally, does today's holding render invalid the *conviction*, as opposed to the *sentence*, in this or any other case." 391 U.S. at 523.

petitioner has exhausted his state remedies with respect to this issue. Finally, in the event it turns out, as now appears, that relief from this death sentence must be ordered, *a local federal court will be far better equipped than are we to frame an appropriate decree with due regard to available Alabama procedures.*

Accordingly, the judgment of the Court of Appeals is vacated, and the case is remanded to the District Court, where the issue that has belatedly been brought to our attention may be properly and fully considered.

(Footnote omitted. Italics mine.)

How a local federal court would be far better equipped to frame a decree more appropriate to available Alabama procedures than would be the Supreme Court by its mandate is not specified, but, in making the observation, the Supreme Court can scarcely be claimed to state a principle of constitutional law upon which this court can rest its instant decision.

*Boulden* followed the currently tortuous path. After judgment and sentence imposing the death penalty had been affirmed by the Alabama Supreme Court, *Boulden v. State,* 278 Ala. 437, 179 So. 2d 20 (1965), the case then moved over into the federal system on a petition for habeas corpus, where retrial was denied. *Boulden v. Holman,* 257 F. Supp. 1013 (N.D. Ala. 1966). The Court of Appeals affirmed, *Boulden v. Holman,* 385 F.2d 102 (5th Cir. 1967), and denied rehearing, 393 F.2d 932, 395 F.2d 169 (1968). Certiorari was thereupon granted by the Supreme Court, 393 U.S. 822, 21 L. Ed. 2d 93, 89 S. Ct. 224 (1968), subsequent to *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968).

The Alabama statute applied in *Boulden* reads as follows:

On the trial for any offense which may be punished capitally . . . it is a good cause of challenge by the state that the person has a fixed opinion against capital . . . [punishment] . . .

Ala. Code, Tit. 30, § 57.

At page 481, speaking of that statute, the *Boulden* opinion observes that:

That statutory standard has been construed by the Alabama Supreme Court to authorize the exclusion of potential jurors who, although "opposed to capital punishment, . . . would hang some men."

In applying the Alabama jury statutes, the trial court and counsel in *Boulden* examined the veniremen no deeper than to elicit a statement that "I don't believe in capital punishment," or to show a similarly vague disapproval of it. In this fashion, 15 prospective jurors were virtually summarily discharged under the statute. But even if court and counsel had conducted inquiries of a more penetrating nature, the *Boulden* decision would probably have been the same, for in it the Supreme Court extended its *Witherspoon* holding to reach a conclusion that the *Boulden* trial record, under the statute as construed, constituted a systematic exclusion of all veniremen who had shown any opposition whatever to the death penalty. *Boulden* thus turns on a record which indicated that many veniremen were summarily excused by the court on state challenges, without argument or further inquiry, because they merely answered that they either had fixed opinions against capital punishment or did not believe in it. In essence, then, the *Boulden* holding is directed against the systematic exclusion of certain kinds of jurors. The Hawkins trial record, however, shows no systematic exclusion whatever of any kind, class or type of juror.

In following what it perceives to be the *Boulden* rationale, this court now departs from the fundamental rule that discretionary power to try challenges is vested in the trial court. Exalting form above substance, the court seems to be looking for a sort of stylized dialogue as a basis for affirming or reversing the trial court's judgment rather than determining whether, from the entire record, the court manifestly abused its discretion. Neither *Boulden, Witherspoon,* nor this court, however, prescribes the catechism expected to be found in the voir dire record and they leave unclear how a trial judge can apply the *Boulden* rationale either as written or in the extension of it now adopted.

If a prospective juror categorically answers that he

would never inflict the death penalty or that he does not believe in capital punishment, and defendant, withholding all objections, is satisfied with these answers, has the trial judge a duty to press the prospective juror sua sponte for more detailed answers? Ought the court on its own initiative probe the juror's psyche when the defendant does not wish to inquire further? Neither *Boulden* nor this court's opinion contemplates the possibility that overexamination of prospective jurors—the interminable courtroom palaver so frequently characterizing juror selection in this country —may instill sub rosa in the venireman's mind more prejudices than it will elicit, nor the likelihood that the practice of pressing veniremen too far is more likely to produce a prejudiced jury than a fair one.

The Washington statute, differing from the cited statutes of Illinois and Alabama, reads as follows:

> No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be compelled or allowed to serve as a juror on the trial of any indictment or information for such an offense.

RCW 10.49.050. It is aimed primarily at prospective jurors, who, because of conscientious scruples against the death penalty, would violate their oath to decide the case upon the evidence. *State v. Riley*, 126 Wash. 256, 218 P. 238 (1923); *State v. Mahoney*, 120 Wash. 633, 208 P. 37 (1922). It has been applied to exclude not only jurors who would be precluded from a finding of guilt, but also those who would automatically find against the imposition of the death penalty. *State v. Smith*, 74 Wn.2d 744, 779, 446 P.2d 571 (1968). We examined this statute recently in a collateral proceeding brought under *Witherspoon* in *State v. Aiken*, 75 Wn.2d 421, 452 P.2d 232 (1969), and held that neither the statute nor *Witherspoon* required formalistic dialogue. We said that there was sufficient basis for excusing a juror if the venireman indicated that his opposition to the death penalty was honest, unyielding and irrevocable. I think this to be a sound principle, well stated and fully consonant with all ideals of due process of law. Now the

court seems to have abandoned this principle and appears to be looking for a kind of formalistic dialogue or catechism as the ultimate test of the *Witherspoon* and *Boulden* decisions. When the prospective juror says, in effect, that his opposition to the death penalty is honest, unyielding and irrevocable, has he passed the new test or must he be pressed further?

Discretion to seat or exclude a juror has always rested with the trial court—where it logically belongs. If a trial judge on the basis of a prospective juror's attitudes toward the death penalty excuses him, that exercise of discretion is —and of course should be—subject to review, but unless the ruling is manifestly an abuse of discretion the error is not reversible. RCW 10.49.040; *White v. Territory of Washington,* 3 Wash. Terr. 397, 19 P. 37 (1888).

Judicial discretion has been described as a sound judgment which is not exercised arbitrarily but with regard to what is right and equitable. *State ex rel. Clark v. Hogan,* 49 Wn.2d 457, 303 P. 2d 290 (1956). Not all rulings rest on the trial court's discretion; discretion is reserved for questions to which no strict rule of law is applicable. Where there is a clearly-defined and well-settled applicable rule of law, the courts are bound to enforce the rule, and discretion in the matter does not exist. *Trunk v. Hertz Corp.,* 32 Ohio Op. 2d 264, 200 N.E.2d 894 (1964). If the law provides no strict and explicit rule, however, the decision necessarily rests on the court's discretion. In the very nature of things, there can be no rigid and explicit rules for determination of jury challenges. Except to vest in the trial court a sound discretion, where else can the discretion to try challenges sensibly be placed? Other than ordaining an appellate contrived catechism and looking for formalistic answers to formalistic questions, how else can trial of challenges be reviewed? Except to search the record for a manifest abuse of discretion in the trial of challenges, what other tests are available to a reviewing appellate court?

What will a reviewing court do when some prospective jurors, in seeking an easy way to avoid an unpleasant task, early in the voir dire divine that a categorical statement

against the death penalty will result in their release from the panel? Who is to decide the bona fides of their answers —the appellate court on review or the trial court at the trial?

Contrast the jury selection procedure as reported in *Witherspoon* and *Boulden* with the careful and painstaking methods employed in picking the Hawkins jury. First, the court informed the Hawkins veniremen that the jury might have to consider imposing the death penalty. As a preliminary inquiry, it asked if there were any in the prospective jury "that does not believe in, or who we'll say believes against capital punishment?" The court then asked one of the prospective jurors, a Mrs. Wolfenbarger, "and you'd feel that even though it is the law that you could not follow this law, is that correct, Mrs. Wolfenbarger?" Similar questions were put to two other veniremen. Petitioner apparently approved of these queries and answers in the selection of a fair and impartial jury panel, for when defense counsel was asked by the court if he wished to interrogate Mrs. Wolfenbarger, he answered, "No, your Honor." He made no objection or contrary indication with respect to the other two jurors. What should the trial court have done at that juncture? Was it under a duty to conduct an independent inquiry when the answers appeared satisfactory to both defense and prosecution, and the court too?

It is quite possible that the defendant, for reasons not appearing of record, welcomed the exclusion of these jurors from his case. He said nothing to convey the slightest dissatisfaction with their being excused. Is silence to be taken now as an objection? Are appellate courts to be held equipped to divine the nonstated objection or challenge? Or, should they continue to go by the record? Of 13 assignments of error, none was directed to the selection of the jury when the Hawkins judgment and sentence was appealed to this court. *State v. Hawkins,* 70 Wn.2d 697, 425 P.2d 390 (1967). Nor was there any claim of error asserted concerning the drawing, examining and impaneling of the jury when the accused petitioned for certiorari and it was

denied. *Hawkins v. Washington,* 390 U.S. 912, 19 L. Ed. 2d 883, 88 S. Ct. 840 (1968).

Our statutes place the trial of challenges where it belongs—before the trial judge. The court's decision seems to place that function now in the appellate courts. How will appellate courts decide those challenges where prospective jurors say one thing one moment and another a few moments later? How will appellate courts resolve the predicament of those jurors who have a genuine difficulty in understanding what court and counsel are driving at in their interrogation? With discretion no longer the test, what will be done with the venireman who in one breath says he cannot under any circumstances vote to impose the death penalty, but in the next says that he can conceive of a case bad enough to induce him to inflict it, and then, during a rehabilitative voir dire, concludes both ways again? In whom should discretion be vested to determine the juror's state of mind—an appellate court reviewing the answers from a typed record, or the trial court who sees the juror and hears his answers?

It is a universal rule that, where the decision of the trial court is a matter of discretion, reversal will lie only upon a showing of abuse of that discretion. *MacKay v. MacKay,* 55 Wn.2d 344, 347 P.2d 1062 (1959). Abuse of discretion means something more than a mere error of judgment. Abuse of discretion is not shown unless the court's discretion was manifestly unreasonable or on untenable legal grounds. *State ex rel. Nielsen v. Superior Court,* 7 Wn.2d 562, 110 P.2d 645, 115 P.2d 142 (1941); *State ex rel. Beffa v. Superior Court,* 3 Wn.2d 184, 100 P.2d 6 (1940). I find nowhere in this record of trial that the court was unreasonable in balancing the interests of the state and the accused in a fair and impartial jury. Except for the three prospective jurors in the Hawkins venire excused by the court on the basis of their early responses—and to which no objection or comment was made by the defense—the record of 153 pages of voir dire examination shows a most scrupulous and painstaking effort by court and counsel to impanel a fair and impartial jury.

At the outset, the trial court told the Hawkins veniremen that one accused of crime is presumed innocent until proven guilty beyond a reasonable doubt and any juror who had reached some conclusions or had preconceived ideas as to the guilt or innocence of the accused would be disqualified. Four jurors, Mrs. Luehrs, Mr. Byers, Mrs. Green and Mr. Johnson, with the consent of the accused, were excused by the court because they had indicated they had in one degree or another formed an impression as to the accused's guilt or innocence. These dismissals were not charged against any of the peremptory challenges. Each prospective juror was carefully examined in detail. So manifestly fair was the voir dire that no issue whatever arose concerning the fair-mindedness and impartiality of the jury ultimately sworn to try the case. After the panel had been questioned and passed for cause by both prosecution and defendant, the defendant exercised only seven peremptory challenges.

During the entire course of the voir dire, according to my calculations, 36 veniremen were examined as possible principal jurors (not including alternates). Of these 36, 15 were excused for cause, and 7 were excused under the defendant's peremptory challenges. The defendant thus had five unused peremptories available. Of the 15 excused for cause, 6 expressed bias on the merits and 1 was excused for family reasons. Eight were excused for bias against capital punishment. Detailed examination of the Hawkins trial record shows a careful, painstaking and prudent effort to select a fair, impartial and unbiased jury, free of prejudice or error or hint of systematic exclusion. The court points to no breach of rules, statutes, principles or precedents governing the selection of juries in capital cases upon which to rest its decision. It finds no abuse of discretion either, but, ruling as though it had, nevertheless reverses.

How will this court's extensions of *Witherspoon* and *Boulden* operate? It is quite likely that to the existing overlong and argumentive process of jury selection unfortunately now standard in American courts, there will be added new imponderables not yet dreamed of. Panels of

veniremen presently subjected to the most exhaustive inquiries, hypotheses, arguments and virtually unrestricted examinations will perforce face new and subtler queries, thus supplying more material for further probings, hypotheses and persuasions. Even the most fair-minded juror, I think, can be badgered by court and counsel into a state of prejudice and intolerance, but the record will not reveal it. The Hawkins jurors were not subjected to this kind of grilling. Although the voir dire was thorough, it so comported with due process and good sense that neither the accused nor the prosecution nor the court saw any issue as to the fair-mindedness and impartiality of the jury. Will this court's new holding engender this same degree of fairness in future capital trials?

Counsel and court, in picking the Hawkins jury, avoided what the court's opinion now invites—either a formalistic catechism based on what are divined to be the requirements of *Witherspoon* and *Boulden* or, in the alternative, a protracted examination inevitably involving prolonged hypothesizing, badgering and arguing with prospective jurors. Catechistic questions designed to elicit a categorical answer that the juror, under no circumstances, could vote to inflict the death penalty, will invite opposing counsel to rehabilitate the juror by conjuring up hypotheses of a most depraved and vicious crime, compelling the juror despite strong conscientious and moral scruples against capital punishment to concede reluctantly that he could bring himself in a particular case to vote to impose it. This was the kind of badgering and argumentation avoided in picking the Hawkins jury, as shown in a record that is quite free of the kind of interminable voir dire palaver which I believe the court's opinion engenders. As earlier observed, defense counsel at no time voiced any objection whatever to the excusing of any venireman, and he accepted the jury with five peremptory challenges unused. It was the kind of jury, I think, which impartially and without prejudice decided the case and determined the punishment according to the evidence.

## II

### The Bifurcated Trial Ordered is Error

I dissent not only to the granting of a new trial in this collateral attack on the judgment and sentence, but to the kind of half trial ordered. The court, I think, is without constitutional power to limit the trial to the issue of penalty, for the power to prescribe procedure in criminal cases lies with the legislature which has established a comprehensive code of criminal procedure. If a new trial is to be granted, the case should be remanded for an entire new trial.

After concluding in essence, as did *Witherspoon*, that in picking the jury which convicted the accused "The State . . . stacked the deck against the petitioner," the court cannot justifiably limit application of the stacked deck principle to the issue of punishment. It amounts to a declaration that, although a judgment of guilt may be entered on the verdict of a prejudiced jury in capital cases, an unprejudiced jury must be selected to decide the punishment. Neither the substance nor the broadest extension of *Witherspoon* and *Boulden*, I think, countenances such a holding. One cannot sensibly stretch the vague and tenuous rationale of those cases, in my opinion, to a point where they become effective authority upon which to oust the statutes of criminal procedure of the state of Washington or to decree a double trial in violation of them.

A most minute sifting of the amorphous ideas conveyed in both *Witherspoon* and *Boulden* will yield little but the most nebulous propositions on which to base the drastic departure now taken from this state's code of criminal procedure governing capital trials. Whatever the two cases may be claimed to stand for, they are aimed essentially at avoiding the systematic exclusion of a class, kind or type of individual who is otherwise qualified to sit as a juror. If this is not the essence of their rationale, then the trial courts lose all discretion to try jury challenges and that function has been transferred to courts of review. Is the court now declaring that if the record shows a catechism on

voir dire which meets with the reviewing court's expectations, then the juror is well seated; if the catechism does not meet the formalistic requirements of the court of review, then the juror should have been discharged.

The Washington statute on jury selection places the discretion in the trial court; it is particularly designed to exclude jurors whose opposition to the death penalty would so affect their judgment as to the guilt or innocence of the accused as to prevent a finding of guilty. It says:

> No person whose opinions are such as to preclude him from finding any defendant guilty of an offense punishable with death shall be compelled or allowed to serve as a juror on the trial of any indictment or information for such an offense.

RCW 10.49.050. This statute has always had a logical place in the statutory scheme surrounding capital punishment. Adopted first in 1854 as Laws of 1854, § 106, p. 119, it was reenacted in the criminal practice act of 1873, Laws of 1873, § 244, p. 236—when jurors had no voice in the punishment. In 1854, murder in the first degree was made punishable by death, without option in the jury to direct a lesser punishment. Laws of 1854, § 12, p. 78. The court, on a verdict of guilty of murder in the first degree, had to impose the death penalty.[5] Again, in 1873, the first-degree murder statute was reenacted (Laws of 1873, § 12, p. 182) with death as the only prescribed punishment. Although those statutes specifically empowered the governor to pardon or commute to life imprisonment, neither authorized a jury to do other than return a verdict as to guilt or innocence. The same provisions were carried into the Code of 1881, § 786, p. 160.

On each reenactment of the death penalty for murder in the first degree, the section above, disqualifying jurors

---

[5]"Every person who shall purposely, and of deliberate and premeditated malice, or in the perpetration, or attempt to perpetrate, any rape, arson, robbery or burglary, or by administering poison, or causing the same to be done, kill another, every such person shall be deemed guilty of murder in the first degree, and upon conviction thereof shall suffer death. But this shall in no case prevent the exercise of the pardoning power of the governor, or the authority to commute the punishment from that of death to imprisonment for life." Laws of 1854, § 12, p. 78.

whose opinions were such as to preclude them from finding one guilty of a crime punishable by death, was similarly reenacted or retained. Laws of 1854, § 106, p. 119; Laws of 1873, § 244, p. 236; Code of 1881, § 1083, p. 202. Similarly, in Laws of 1891, ch. 69, § 1, p. 119, punishment for murder in the first degree was again fixed at death, and the same provision as to jurors, with only a minor change not here pertinent, was reenacted. Laws of 1891, ch. 28, § 67, p. 59.

The statute was obviously enacted, reenacted and re-tained to insure that jurors who sit in capital cases will not, because of personal opposition to the death penalty, evade their sworn duty to return a true verdict solely upon the evidence.

In 1909, the legislature, for the first time, departed from a mandatory death sentence and gave the court discretion to prescribe punishment in capital cases. Laws of 1909, ch. 249, § 140, p. 930, declaring:

> Murder in the first degree shall be punished by death or by imprisonment in the state penitentiary for life, *in the discretion of the court.*

(Italics mine.) Then, in 1913, the death penalty was abolished, Laws of 1913, ch. 167, p. 581, and the legislature made murder in the first degree punishable by life imprisonment. But with the reinstitution of the death penalty in 1919, discretion to prescribe it was shifted from the judge (Laws of 1909, ch. 249, § 140, p. 930) to the jury, and the penalty for murder in the first degree fixed at life imprisonment unless the jury by special verdict affirmatively prescribed the death penalty. Laws of 1919, ch. 112, p. 273 (RCW 9.48.030). Only the jury which tries the case and that jury alone has the power to prescribe the death penalty. RCW 9.48.030.

The statute under which the petitioner here was tried, defining and punishing murder in the first degree, explicitly makes the special verdict of the trial jury a precondition to imposition of the death penalty, as follows:

> Murder in the first degree shall be punishable by imprisonment in the state penitentiary for life, unless *the*

> jury shall find that the punishment shall be death . . . *the* jury shall, if it find the defendant guilty, also find a special verdict as to whether or not the death penalty shall be inflicted . . .

(Italics mine.) RCW 9.48.030. The issue of the death penalty, yes or no, is thus resolved in a special verdict rendered by the very jury that ascertains guilt. No sensible meaning can be found in the statute except that *the* jury which tried the case, *the* particular jury selected, impaneled and sworn to render a true verdict, shall make the decision; that jury and no other is charged by law with deciding the fate of the accused. Thus the legislature has specifically vested in the jury which tries the case, and that jury alone, the power to prescribe the death penalty. In empowering a different jury to decide punishment than the one which determines both guilt and mental condition, the court, I think, now violates these statutes. RCW 4.44.410, 9.48.030.

Other statutes relating to the trial of capital cases are compatible only with the one-jury principle. If a plea of insanity or mental irresponsibility is interposed, the court shall instruct *the* jury when giving *the* charge that in case of an acquittal by reason of mental irresponsibility *the* jurors must return special verdicts stating whether the accused committed the crime, whether they acquit him because of insanity or mental irresponsibility at the time of commission, whether the insanity continues and exists at trial, whether if not there is a likelihood of a relapse or recurrence of the mental condition and whether the defendant is unsafe to be at large. RCW 10.76.030. In another section, defendants in capital cases are entitled, on demand, to have a list of petit jurors supplied them at least 24 hours before trial. RCW 10.46.030. This obviously means a list of jurors who will try all issues raised by pleas to the indictment or information. Trial shall be conducted largely in the same manner as are civil cases. RCW 10.46.070. This includes the manner of selecting and impaneling a jury. RCW 10.49.020. Peremptory challenges, 12 in *prosecution* for capital offenses and 6 for lesser offenses, are authorized by

statute. RCW 10.49.060. The term *prosecution* as used in this section must be taken to mean the trial of all issues raised by indictment or information and plea—and cannot, as the court now does, be read to apply only to the issue of the death sentence. And even the statutory provision for alternate jurors, RCW 10.49.070, contemplates a complete trial on all issues.

Again, the oath taken by jurors does not contemplate that separate or different jurors shall try the issue of punishment. It is susceptible of no meaning except that the prescribed oath shall be taken by the jury which will try the entire case:

> The jury shall be sworn or affirmed well and truly to try the issue between the state and the defendant, according to the evidence, and in capital cases to well and truly try, and true deliverance make between the state and the prisoner at the bar whom they shall have in charge, according to the evidence.

RCW 10.49.100. Accordingly, the court, in remanding the case for a trial of the death sentence issue only, exceeds its constitutional powers in the field of criminal procedure and unconstitutionally deprives the accused of a jury selected to try his case in the manner provided by law.

In summary, I think the writ should not issue at all. Nothing in this record shows a systematic exclusion of a class or group of like-minded veniremen from the jury. Nothing in the record establishes that the jurors who tried the case had been unfairly selected or impaneled in violation of any rule, precedent or statute. The record is devoid of a showing that the jury was rigged, or stacked, by the state against the accused or that *Witherspoon* and *Boulden* warrant or support a vacating of this conviction. Finally, assuming that a new trial is warranted, an assumption in which I do not concur, it must be a new trial on the entire issues of count 2, the count charging the murder of Bonnie Lee Walch, and cannot be limited constitutionally to imposition of the death penalty only.

HUNTER, C. J. (dissenting)—I concur with the dissent, that the death penalty should be affirmed.